**Jack GITTLEMACKER, Appellant,**

v.

**Arthur T. PRASSE, Commissioner of Prisons of Pa. and Frank C. Johnston, Warden, State Correctional Institution, Dallas, Pa.**

No. 18249.

United States Court of Appeals,
Third Circuit.

Submitted April 10, 1970.

Decided June 12, 1970.

---

Jack Gittlemacker, pro se.

Frank P. Lawley, Jr., Deputy Atty. Gen., Harrisburg, Pa., William C. Sennett, Atty. Gen., on the brief, for appellees.

Before SEITZ and ALDISERT, Circuit Judges, and LATCHUM, District Judge.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

In this appeal we are confronted with the increasingly recurrent claim that the civil rights of appellant, an inmate of a state penal institution, have been violated by prison officials. The mounting frequency of civil rights claims, under 42 U.S.C. § 1983, in the federal courts cannot escape attention. Nor can the phenomenon that a large percentage of these complaints, drafted *pro se* by prisoners lacking the perspicacity or restraint of professional draftsmen, are improvidently filed.[1] These circumstanc-

---

1. There were 1195 civil rights actions filed in the United States district courts in 1967. This number increased to 2479 in 1969. Annual Report Administrative Office of the United States Courts. Chevigny, Section 1983 Jurisdiction: A Reply, 83 Harv.L.Rev. 1352, 1354 (1970), reports that an examination of the first 100 private civil rights cases reported in

the Federal Supplement from December, 1966 to March, 1968 disclosed the following results:

| | |
|---|---|
| Preliminary relief granted | 12 |
| Motion to dismiss denied | 12 |
| Trial or hearing ordered | 2 |
| Summary judgment for defendant or motion to dismiss granted | 67 |

es prompt us to explore the issues presented here in greater depth than disposition of the case might otherwise demand.

Appellant, while confined at the State Correctional Institution at Dallas, Pennsylvania, filed this action against the state Commissioner of Correction and the Dallas superintendent. Invoking the Civil Rights Act of 1871, 42 U.S.C. § 1983, and its jurisdictional implementation, 28 U.S.C. § 1343(3), appellant alleged a galaxy of constitutional infringements couched in broad, conclusory language. Included were the charges that the prison authorities had denied him "the right kind of [medical] treatment" by transferring him to an institution where adequate care was unavailable, that they discriminated against him because he is a Jew, denying him the services of a rabbi, and that prison regulations relating to the preparation of legal papers denied him due process. The Dallas superintendent responded with a motion for summary judgment supported by affidavits, and upon finding no genuine issue of any material fact, the court below dismissed the complaint.

In judging the propriety of the dismissal, we begin with a review of the legislation on which appellant bases his claim for relief. Section 1983 of Title 42 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

It is clear from the statute's express language that, like federal habeas corpus in this respect, a civil rights complaint must portray specific conduct by state officials which violates some constitutional right of the complainant in order to state a claim for relief. In the case of a prisoner, the determination of what constitutes an actionable claim may become difficult since imprisonment unavoidably results in the forfeiture of certain rights and privileges commonly exercised in a free society. The loss of these rights has been recognized by the Supreme Court as "a retraction justified by the considerations underlying our penal system." Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948).

Stated simply, a man in jail is not a free man; the denial of his right to drink fully from the cup of freedom is the very hypostasis of confinement. For reasons grounded more in historic precedent and expediency than justified by even the most primitive notions of social rehabilitation, imprisonment as a form of punishment persists. As the eminent psychiatrist, Karl Menninger, observes, "the idea of punishment as the law interprets it seems to be that inasmuch as a man has offended society, society must officially offend him. It must deliver him a tit for the tat that he committed \* \* \* [Society must] deprive a man of decent social relationships, palatable food, normal friendships and sexual relations, and constructive communication. \* \* \* " 2

But so long as incarceration as a form of punishment continues, we are required perforce to recognize that, archaic and indefensible though it may be, its objective is to circumscribe certain activities and opportunities not only available in, but also characteristic of, an

---

Judgment for plaintiff after hearing or trial    5
Judgment for defendant after hearing or trial    2
Considering that some 67% of the cases reported in the Federal Supplement were subject to summary disposal, one could easily visualize an even more dramatic figure among the unreported decisions where a short memorandum is often employed to dismiss an action.

2. Menninger, The Crime of Punishment, 71–72.

open societal setting. And, unpleasant as it is to contemplate the physical restrictions of a "settled environment", we must also recognize that even those rights which survive penal confinement may be diluted by peculiar institutional requirements of discipline, safety, and security.

To determine, with precision, those rights which follow an inmate into prison involves a process of weighing and balancing conflicting interests. The desire that there be a maximum opportunity for the exercise of rights and privileges may often collide with the practical necessities of managing and administering a complicated penal community. The task of striking the proper balance between these conflicting interests is generally within the competence of the prison authorities. Thus, the federal courts have been understandably reluctant to intervene in matters of state prison administration, recognizing that a wide latitude for judgment and discretion must be extended to prison officials.

At the same time, however, the federal courts have been sensitive to certain particularized complaints, foremost among which have been allegations of religious discrimination. In such cases, the courts have not hesitated to intervene where prison officials have unreasonably attempted to curtail the practice of religion by prison inmates. See Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L. Ed.2d 1030 (1964); Walker v. Blackwell, 360 F.2d 66 (5 Cir. 1966); Pierce v. La-Vallee, 293 F.2d 233 (2 Cir. 1961). Usually the cases have involved a denial of the use of available services or facilities or materials. But the test of what actions are unreasonable restraints on the exercise of religion has of necessity proceeded on an *ad hoc* basis. In Long v. Parker, 390 F.2d 816, 822 (3 Cir. 1968) this court, speaking through Judge Forman, said: "To justify the prohibition of religious literature, the prison officials must prove that the literature creates a clear and present danger of a breach of prison security or discipline or some other substantial interference with the orderly functioning of the institution."

Appellant's contention is more sophisticated. He is alleging a violation of the Free Exercise Clause because the state has not supplied him with a clergyman of his faith. Thus we have the antithesis of the cases arising under the Establishment Clause: This is not a charge that the state is supporting a religion, but a complaint that it is not.

■ The requirement that a state interpose no unreasonable barriers to the free exercise of an inmate's religion cannot be equated with the suggestion that the state has an affirmative duty to provide, furnish, or supply every inmate with a clergyman or religious services of his choice. It is one thing to provide facilities for worship and the opportunity for any clergy to visit the institution. This may be rationalized on the basis that since society has removed the prisoner from the community where he could freely exercise his religion, it has an obligation to furnish or supply him with the opportunity to practice his faith during confinement. Thus, the Free Exercise Clause is satisfied.

But, to go further and suggest that the Free Exercise Clause demands that the state not only furnish the opportunity to practice, but also *supply* the clergyman, is a concept that dangerously approaches the jealously guarded frontiers of the Establishment Clause. As expressed in Everson v. Board of Education, 330 U.S. 1, 16, 67 S.Ct. 504, 91 L.Ed. 711 (1947): "Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice versa*. In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between Church and State'."

Moreover, there is the consummate problem of the sheer number of religious sects. In 1942, it was said: "There are in the United States more than 250 distinctive established religious denominations. In the State of Pennsylvania there

are 120 of these * * *." [3] Without speculating on our contemporary experience of denominational proliferations, and using the figures of three decades past, it becomes readily apparent that to accept appellant's contention is to suggest that an extravagant assemblage of clergymen stand in readiness at each state prison. Although we do not reach this question, we do recognize that explicit in the First Amendment are two separate and distinct concepts designed to guarantee our religious liberties—the Establishment Clause and the Free Exercise Clause; and that under certain circumstances a slavish insistence upon a maximum interpretation of rights vested by the latter clause may lead to a collision with the restrictions of the former. We must be ever mindful of the rationale of the school prayer cases and the historic alarm: "[I]t is no defense to urge that the religious practices here may be relatively minor encroachments on the First Amendment. The breach of neutrality that is today a trickling stream may all too soon become a raging torrent and, in the words of Madison, 'it is proper to take alarm at the first experiment on our liberties'." [4]

We do not reach the question because appellant's allegations of discrimination were not substantiated in fact. He alleged that the Dallas officials have denied Jewish inmates a rabbi "in regular attendance although Catholic and Protestant Chaplains are provided for." But in answering affidavits, the prison superintendent explained:

> The small number of Jewish inmates at Dallas, usually two or three, makes the use of a full time Rabbi economically unfeasible and unwarranted. Therefore no provision will be made for a full time Jewish Rabbi to serve as Chaplain at the institution.

With regard to providing Jewish inmates with the services of a rabbi, the superintendent also declared:

> I have, on numerous occasions, attempted to secure the services of a Jewish Rabbi to come to the State Correctional Institution at Dallas. This was recently accomplished, and we are now negotiating with a Rabbi from Kingston, Pennsylvania to come to the institution on a fee basis. All previous efforts to secure a Rabbi have met with failure.

■ We conclude, as did the court below, that the superintendent's affidavit effectively and conclusively refuted appellant's claim of religious discrimination. As we said in Lockhart v. Hoenstine, 411 F.2d 455, 459 (3 Cir. 1969), where the validity of summary judgment against a *pro se* civil rights complainant was also in issue: "It is no legitimate function of the court to assume the existence of a genuine issue of material fact when in truth none exists." Summary judgment was therefore appropriate to dispose of appellant's claims of religious discrimination.[5] Fed.R.Civ.Pro. 56(e); Tripoli v. Wella, 425 F.2d 932 (3 Cir. 1970); Lockhart v. Hoenstine, *supra.*

We also conclude, for reasons different from those expressed by the district court, that summary judgment was an appropriate disposition of appellant's claims of inadequate or inappropriate medical care. As noted previously, an essential element of an actionable civil rights complaint is the establishment of a *constitutional* deprivation. This, of course, suggests the question: Under what circumstances may it properly be said that allegations of medical malpractice by prison administrators attain constitutional proportions?

In Commonwealth ex rel. Gatewood v. Hendrick, 368 F.2d 179, 180 (3 Cir.

---

3. West Virginia State Board of Education v. Barnette, 319 U.S. 624, 658, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (Frankfurter, J., dissenting).

4. School District of Abington v. Schempp, 374 U.S. 203, 225, 83 S.Ct. 1560, 10 L.Ed. 2d 844 (1962).

5. Appellant also alleged that the required Passover diet was unavailable to Jewish inmates. This matter was dismissed as moot by the district court when it became apparent from the answering affidavits that such special meals had been arranged during the recent Passover.

1966), cert. den., Gatewood v. Hendrick, 386 U.S. 925, 87 S.Ct. 899, 17 L.Ed.2d 797 (1967), this Court held that allegations of improper medical treatment by prison officials did not assert "a denial of rights secured by the federal Constitution or laws." This position was reiterated in two cases decided the same day in 1969, one of which involved the appellant in this case. United States ex rel. Gittlemacker v. County of Philadelphia, 413 F.2d 84 (3 Cir. 1969); Fear v. Commonwealth, 413 F.2d 88 (3 Cir.), cert. den., 396 U.S. 935, 90 S.Ct. 278, 24 L.Ed.2d 234 (1969).

▮▮ These cases teach that an allegation of negligent conduct by a state public official is not sufficient, in and of itself, to bring a claim within section 1983. More is needed than a naked averment that a tort was committed under the color of state law; the wrongdoing must amount to a deprivation of a right, privilege, or immunity secured by the Constitution and the laws of the United States. And this must be set forth with specificity; mere argumentative and conclusory allegations will not suffice.

The requirement of some semblance of factual specificity becomes necessary if the federal courts are to exercise jurisdiction under the Civil Rights Act. Without a proper allegation of constitutional deprivation, an action requesting damages for personal injuries sounds only in common law or statutory tort and, because no federal interest is involved, is triable only under state law in a state court.

▮▮ It is only where an inmate's complaint of improper or inadequate medical treatment depicts conduct so cruel or unusual as to approach a violation of the Eighth Amendment's prohibition of such punishment that a colorable constitutional claim is presented.[6] Other courts have made similar holdings. And

although these decisions have not been characterized by a uniformity of expression in enunciating standards for measuring the adequacy of a claim under Section 1983, they have consistently held that much more is required than an allegation of tortious conduct. Many cases describe the necessary additive as "exceptional circumstances."[7] In Eaton v. Ciccone, 283 F.Supp. 75 (W.D.Mo.1966), the court equated these exceptional circumstances specifically with cruel and unusual punishment proscribed by the Eighth Amendment. Such conduct was characterized in Jordan v. Fitzharris, 257 F.Supp. 674, 679 (N.D.Cal.1966) as so grossly incompetent, inadequate or excessive "as to shock the general conscience or to be intolerable to fundamental fairness."

▮ We perceive no such unconscionable or intolerable conduct alleged here. On the contrary appellant's claim amounts to no more than an averment that the facilities at Dallas are inferior to those at Philadelphia in providing him the care he requires. Accepting the veracity of these allegations, as we must on a motion for summary judgment, they nonetheless lack any semblance of stating a claim of constitutional deprivation.

Appellant also attacks prison rules which prohibit an inmate from maintaining a private law library in his cell, and adds the frivolous claim that failure to provide him with a typewriter is a constitutional deprivation. The superintendent stated in his affidavit:

It is the policy of the Bureau of Correction and of this institution that no inmate may maintain in his cell a law library. This policy is based on the necessity for prevention of the accumulation of vast quantities of paper material in the cells of inmates. A substantial fire hazard exists if the

---

6. The Cruel and Unusual Punishment Clause of the Eighth Amendment is applicable to the states through the Fourteenth Amendment. Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

7. See Henderson v. Pate, 409 F.2d 507, 508 (7 Cir. 1969); United States ex rel. Lawrence v. Ragen, 323 F.2d 410 (7 Cir. 1963); Hurley v. Field, 282 F.Supp. 34 (C.D.Cal.1968); Goodchild v. Schmidt, 279 F.Supp. 149 (E.D.Wis.1968).

amount of paper material in the cell is allowed to get out of hand. Plaintiff has adequate legal materials in the prison library and may order any case relevant to an action he has in court but may not establish a law library.

Access to the courts is guaranteed by the due process clause of the Fourteenth Amendment. But prison regulations which reasonably limit the times, places, and manner in which inmates may engage in legal research and preparation of legal papers do not transgress this constitutional protection so long as the regulations do not frustrate this access. Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1968); see also DeWitt v. Pail, 366 F.2d 682 (9 Cir. 1966); Walker v. Pate, 356 F.2d 502 (7 Cir.), cert. den. 384 U.S. 966, 86 S.Ct. 1598, 16 L.Ed.2d 678 (1966); Kirby v. Thomas, 336 F.2d 462 (6 Cir. 1964). Viewed from this perspective, and considered in the light of the superintendent's explanations, we find no merit in appellant's attack on the prison regulations.

The judgment of the district court will be affirmed.

SEITZ, Circuit Judge, concurs in the result.