Peter Joseph BIAGIARELLI, Appellant in No. 72-2139,

v.

Allyn R. SIELAFF, Commissioner of Corrections et al., Appellants in 72-2138.

Nos. 72-2138, 72-2139.

United States Court of Appeals, Third Circuit.

Argued June 18, 1973.

Decided July 26, 1973.

---

Donetta W. Ambrose, Asst. Atty. Gen., Pittsburgh, Pa., Israel Packel, Atty. Gen., for appellant in No. 72–2138 and appellee in No. 72–2139.

Michael A. Donadee, Neighborhood Legal Services Assn., Pittsburgh, Pa., for appellee in No. 72–2138 and appellant in No. 72–2139.

Before VAN DUSEN, ALDISERT and ADAMS, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

This is a civil rights action arising out of a complaint filed by a prisoner, Peter Biagiarelli, who is confined in the Western Pennsylvania Correctional Institution at Pittsburgh.[1] Jurisdiction was invoked pursuant to 28 U.S.C. §§ 1343 and 2201, and 42 U.S.C. §§ 1983 and 1985. Biagiarelli alleges that he has been deprived of certain of his constitutional rights, in particular his Eighth and Fourteenth Amendment rights, by having been placed in segregated confinement without a due process hearing.[2] After hearing argument and testimony, the district court directed a declaratory judgment be entered in favor of the

---

[1]. The opinion is reported in 349 F.Supp. 913 (W.D.Pa.1972).

[2]. Plaintiff's amended complaint sought to enjoin the defendants from confining him in solitary confinement without prior notice, or hearing, and a declaratory judgment that such confinement deprived him of due process of law and caused him to be subjected to cruel and unusual punishment. Plaintiff did not seek monetary damages.

plaintiff.[3] After careful consideration, the record requires that the district court order be vacated and the case remanded to the district court for proceedings consistent with this opinion.

Plaintiff charged in his complaint that he was taken from his cell on October 19, 1971, without notice or warning, and placed in solitary confinement, where he remained until December 24, 1971.[4] The prison authorities defended their action on the basis that they had received information that Biagiarelli was involved in a conspiracy to escape from prison and that an emergency situation existed which required prompt action. The district court included this finding in its opinion (349 F.Supp. at 914):

"The prison authorities presented evidence that an emergency situation existed on October 19, 1971. They were unable to give him any hearing because they had received information of a conspiracy for a prison break in which plaintiff was involved from re-liable sources, to wit: the Chief of Police of the City of Pittsburgh. In their judgment this emergency situation justified placing the plaintiff in solitary immediately for reasons of security."

The defendants assert in their appeal that since Biagiarelli was placed in "administrative" segregation, as opposed to "punitive" segregation, he was not entitled to the minimal due process requirements set out by the district court. These included: (1) a written notice of charges; (2) a statement of the general nature of evidence supporting the charges; and (3) a hearing before a designated official where the prisoner has an opportunity to respond to charges. See note 3, *supra.*

The plaintiff has filed a cross-appeal contending that the opinion and order of the district court did not provide sufficient safeguards for a prisoner subject to isolation from the general prison population.[5]

---

3. That judgment provided, *inter alia:*
   "It is ordered that a declaratory judgment be and hereby is entered declaring that the procedures employed in placing or detaining plaintiff in solitary confinement, punitive or administrative segregation without notice of charges, statement of evidence or opportunity to respond violate plaintiff's rights to due process of law as accorded him by the Fourteenth Amendment to the Constitution of the United States.

   \*     \*     \*     \*     \*

   ".  .  .  a permanent injunction shall issue against defendants restraining them from placing plaintiff, causing him to be placed, or detaining him in solitary confinement, punitive or administrative segregation unless and until minimal standards of due process are met, which, at the very least must include the following:

   (1) he is given express written notice of the charges against him;
   (2) he is given a statement of the general nature of the evidence supporting the charges; and

   (3) he is granted a hearing before a designated official whereby he will have an adequate opportunity to respond to the charges against him.

   "It is further ordered that such procedures are to be utilized prior to the transfer of plaintiff to segregation unless the transfer is warranted by an emergency threatening the security of the institution; in such event, the designated procedures are to be implemented within 10 days thereafter."
   349 F.Supp. at 918.

4. There was a dispute in the testimony as to whether Biagiarelli was informed of the reason for his detention. He testified that "I was told I was there for suspicion, but they weren't at liberty to give me the information why or what suspicion meant." N.T. 7. The Deputy Supervisor for Operations, Charles Wehrle, stated: "I informed him [Biagiarelli] that we had received information that there was a conspiracy, and that he was in the maximum security block pending the outcome of our investigation." N.T. 19–20.

5. Plaintiff requests this court to grant:
   "(a) A declaration that a prisoner may not be isolated from the general prison population to solitary confinement with-

In Gray v. Creamer, 465 F.2d 179 (3d Cir. 1972), we were presented with the claim that "[the] plaintiffs' Fourteenth Amendment right to due process of law was abridged by the circumstances of their transfers from the general prison population to 'segregation' or 'punitive segregation.'" 465 F.2d at 184. In *Gray* we held that:

". . . the transfer of a prisoner from the general prison population to solitary confinement without either notice of the charges or a hearing [6]

"[6]. This is not to say, of course, that this notice or hearing must in all cases precede the transfer to solitary confinement; in some cases, as, for example, during a prison riot, notice and hearing must be delayed a reasonable period of time.

does not, absent unusual circumstances . . ., meet minimal due process requirements."

465 F.2d at 185.

The extent of the rights guaranteed to a state prisoner under the Fourteenth Amendment is not unlimited.[6] As Judge Aldisert explained in Gittlemacker v. Prasse, 428 F.2d 1, 4 (3d Cir. 1970):

"To determine, with precision, those rights which follow an inmate into prison involves a process of weighing and balancing conflicting interests. The desire that there be a maximum opportunity for the exercise of rights and privileges may often collide with the practical necessities of managing and administering a complicated penal community. The task of striking the proper balance between these conflicting interests is generally within the competence of the prison authorities. Thus, the federal courts have been understandably reluctant to intervene in matters of state prison administration, recognizing that a wide latitude for judgment and discretion must be extended to prison officials."

This case presents an example of the "unusual circumstances" referred to in *Gray*. Here the prison authorities, in order to maintain control and to insure the continued security of the institution, were entitled to postpone notice of the charges, or the holding of a hearing for a reasonable period of time. See *Gray, supra*, 465 F.2d at 185 n.6. This was not the ordinary case of a prisoner being placed in administrative or punitive segregation [6a] for disciplinary pur-

out a due process determination of the grounds for the transfer;

"(b) A declaration that a due process hearing be held prior to the transfer of a prisoner from the general prison population to solitary confinement, which includes the following elements:

"(1) adequate written notice of the charges

"(2) a summary of the evidence against him

"(3) a hearing before an impartial decision maker

"(4) the opportunity to present witnesses in his own behalf, and to cross-examine adverse witnesses

"(5) the right to be represented by counsel or lay advisor

"(6) a written decision, based on evidence addreed [sic] at hearing, setting forth findings of fact and conclusions of law

"(7) a right to appeal

"(c) A declaration that such rights must be accorded a prisoner regardless of the label attached to the segregation, and that there is no permissible distinction between isolation for purposes of punishment, and isolation for purposes of administrative necessity."

[6]. In *Gray*, we quoted this language of the Supreme Court from Hannah v. Larche, 363 U.S. 421, 442, 80 S.Ct. 1502, 4 L.Ed. 2d 1307 (1960), concerning the requirements of "due process":

"'Whether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, and the possible burden of that proceeding, are all considerations which must be taken into account.'" [Footnote omitted.]
465 F.2d at 185.

[6a]. We note that under the new regulations of the Pennsylvania Bureau of Correction (see Appendix), the term "Behavior Adjustment Unit" is used, appar-

poses,[7] but the case of a prisoner alleged to have been involved in a conspiracy to escape from the prison.

We disagree with the district court's order establishing a per se rule that the placement of a prisoner in solitary confinement, whether punitive or administrative segregation according to the previous Pennsylvania terminology, without written notice of the charge, a statement of the general nature of the evidence, and a hearing, constitutes a constitutional deprivation. See United States ex rel. Arzonica v. Scheipe, et al., 474 F.2d 720 (3d Cir. 1973).

■ We are not prepared to hold that the due process clause requires the prison authorities to provide a prisoner with a statement of the evidence, which forms the basis for the removal of the prisoner from the general prison population.[8] Even where the question is raised at the time of a criminal trial in the federal courts, the defendant generally is not entitled to have the prosecution furnish him with a detailed statement of the evidence the prosecution plans to use.[9]

■ Biagiarelli was only entitled to either written notice of the basis for his removal from the prison population and an opportunity to rebut the charge, or a hearing. When the notice reasonably should have been given, or the hearing held, depended on when the threat to the institution subsided, regardless of whether he was held in punitive or administrative segregation. It is not feasible for courts to adopt hard and fast rules that will apply to every institution, or to ev-

ery situation that might arise within a particular institution. Emergency conditions may require prompt and decisive administrative actions, and what is reasonable must be measured against the urgency of the circumstance necessitating the action. See *Arzonica, supra.* This rule of reason involves the weighing and balancing of conflicting interests referred to in Gittlemacker v. Prasse, *supra,* 428 F.2d at p. 4. See United States ex rel. Tyrrell v. Speaker, 471 F.2d 1197, 1201 (3d Cir. 1973).

Since the notice of appeal was filed on October 30, 1972, the Bureau of Correction in Pennsylvania has issued new guidelines for all state correctional facilities. See Administrative Directive, Bureau of Correction, BC-ADM 801 (Parts I, III and IV are set forth in the Appendix). These regulations, which took effect on November 1, 1972, reflect a careful effort to comport with this court's position in *Gray* and the district court should have an opportunity to consider them. It appears, however, that they do not provide for either notice of the charges or a hearing where administrative custody, which may continue for at least 30 days before an interview with the Program Review Committee, is involved, even though no threatened prison breach or similar emergency is present.

The district court's September 13, 1972, Final Decree and Declaratory Judgment will be vacated and the case remanded for reconsideration in light of this opinion and Administrative Directive BC-ADM 801.

---

ently in place of punitive segregation. Section III–G–4 provides that, where a Major Misconduct Report is involved, placement of an inmate may be in Administrative Custody or the Behavior Adjustment Unit. See also Section IV.

7. The language quoted in *Gray* from Sostre v. McGinnis, 442 F.2d 178, 198 (2d Cir. 1971), which the district court apparently adopted in framing its decree, was restricted to "most cases" and not the unusual case where a conspiracy to escape from the prison is involved.

Furthermore, quotations from other circuits do not establish rules of law in this circuit, particularly where the difference between the facts in the *Gray* case and this case is so marked.

8. See note 7, *supra,* for comment on quotation from Sostre v. McGinnis, *supra,* appearing in Gray v. Creamer, 465 F.2d at 185.

9. See 1 Wright, Federal Practice and Procedure, Criminal, § 129 (1969 ed.).

APPENDIX

BC-ADM 801

Administrative Directive

Subject:
Adjustment of Behavior

Commonwealth of Pennsylvania
Department of Justice
Bureau of Correction

## I. SCOPE AND PURPOSE

Institutional life shall be governed by standards of behavior designed to promote correctional objectives and to maintain the general welfare of the institutional community. The laws of this Commonwealth, the rules and regulations of the Bureau of Correction and of the institution are a part of the standards of behavior governing each institution.

Behavior which deviates from such standards shall be handled by staff in the manner prescribed by this directive. Such behavior shall be evaluated within the context of the total treatment plan of the individual, the effect of such behavior upon others and its consequences for the good order of the entire institution.

The methods used by staff shall be for the purpose of bringing about voluntary compliance with the standards prescribed. Sanctions shall be imposed only when necessary and in the degree necessary to regulate the unacceptable behavior.

\*    \*    \*    \*    \*    \*

## III. PROCEDURES

A. Behavior problems which may be resolved by immediate counseling, warning or verbal reprimand shall be dealt with accordingly by the staff person involved. More serious violations shall be the subject of a Misconduct Report.

B. The JBC-141 form (Misconduct Report) shall be changed in style to a three-sheet snap set, one copy of which must be given directly to the resident by the staff member who writes the Misconduct Report. No action on the Misconduct Report will be taken unless this is done. One copy shall be retained by the staff person who wrote the misconduct. The third copy shall be forwarded to the Deputy Superintendent for Treatment Services.

C. As copies of the Misconduct Reports are received, the Deputy Superintendent for Treatment Services shall divide them into minor and major categories, consistent with the general intent of this directive. Major misconduct shall ordinarily be limited to acts which violate the penal laws of the Commonwealth or to repetitive violations of rules and regulations.

D. Minor Misconduct Reports shall be referred to the resident's support team—the team to include the individual resident's counselor, his housing unit officer and the relevant work and/or school supervisor. In the absence of any team member, his immediate supervisor shall substitute. The team shall be scheduled by the most appropriate member depending on the physical structure and general institutional procedures of each institution. The convening of the team shall be within 36 hours of the report, except that reports filed on Friday and Saturday shall be heard the following Monday. The team shall meet with the staff person who initiated the report and the resident involved at any convenient location. The meeting shall be conducted as an informal but private group discussion aimed at achieving consensus in terms of the

situation rather than as an adversary proceeding. The primary objectives shall be to gain accurate knowledge of the facts, an understanding of the underlying causes of the behavior and to arrive at a sound decision for the treatment and control of the behavior exhibited. One or more of a wide range of alternative dispositions may be used as indicated by the individual situation, i. e., counseling, peer group interaction, group therapy, assessment of damages for property willfully destroyed, change of cell, restriction of privileges, reclassification with respect to custody or program status, and recommendation for transfer. Segregation status shall not be imposed by the support team. If the support team concludes on the basis of previous work with the resident that more serious sanctions may be appropriate, the team may refer the matter to the Hearing Committee with a written explanation regarding the referral. The decision of the team shall be reached in the presence of the resident and the staff member concerned when possible, but in all cases shall be given immediately to both parties along with the rationale for the decision. It will also be within the authority of the team to expunge the meeting from the record when they feel this warranted. As a general rule, Misconduct Reports handled by the team will not be formally entered against the resident's record for purposes such as parole, commutation, etc., but shall be recorded on the JBC-14 form only.

E. Major misconducts shall be referred to the Hearing Committee which shall be composed of the Chairman who shall be the permanent member (Major of the Guard), the resident's counselor or his immediate supervisor, and the resident's work/school supervisor or his immediate supervisor. When the matter has been referred from the support team, the counselor and work supervisor shall always be replaced by a supervisor.

F. Where the case has been referred to the Hearing Committee, the resident shall be informed in writing of this fact and given a specific date for a formal hearing; he shall be permitted assistance in presenting his case from either any staff member or any resident in general population status; he shall be permitted to meet with the person he chooses an appropriate length of time before the hearing; he shall be permitted to call witnesses at the hearing, the number of which shall be regulated by the Chairman of the Hearing Committee. The hearing shall be conducted in the following manner:

1. The circumstances of the charge shall be read and fully explained by the Chairman.

2. The resident shall be permitted to admit or deny the charges.

3. The staff person writing the Misconduct Report shall present his information and may call witnesses to support his claim.

4. The resident may present information available to him and others, with help from whomever he has chosen to assist him.

5. The committee members may interrogate the person making the report, the resident and others as necessary.

6. Upon completion of the hearing, the Hearing Committee shall take the matter under advisement.

7. After the decision is reached by the committee, the presenting parties shall be called before the committee to hear the decision and to be advised of its rationale and consequences.

8. A committee decision shall be based upon substantial evidence.

9. The resident shall be informed that the decision of the Hearing Committee will be formally re-

viewed by the Program Review Committee upon the resident's request. The resident shall indicate in the Misconduct Report whether he does or does not want a formal review and so attest by his signature.

G. The Hearing Committee may take the following actions:

1. Dismiss the charges.

2. Reprimand.

3. Adjust in accordance with measures outlined in III. D. above.

4. Invoke sanctions, including placement in Administrative Custody or the Behavior Adjustment Unit, but only when the acts of the resident indicate a continuing threat to himself or others.

H. The resident shall be entitled to have any decision of the Hearing Committee reviewed by the Program Review Committee, composed of the Deputy Superintendent for Operations, the Deputy Superintendent for Treatment Services and the Director of Treatment. In the absence of one of the foregoing committee members, the Superintendent shall designate an appropriate substitute. This committee shall not only review such decisions upon the resident's request, but shall also review weekly the program status of each resident in the Behavior Adjustment Unit, Administrative Custody, and Psychiatric Unit. This committee shall review the programming in these units and shall recommend changes when necessary.

I. Upon receiving a request for review of the Hearing Committee's decision, the Program Review Committee shall notify the interested resident and the Chairman of the Hearing Committee of the time set for the review. When that time arrives the hearing shall be held in the following manner:

1. The resident, with assistance if desired, shall present his objections to the decision.

2. The Chairman of the Hearing Committee shall present the case for the decision.

3. The Program Review Committee may question the individuals regarding the facts and the rationale for the decision.

4. The Program Review Committee shall take the matter under advisement and promptly render the decision, together with the rationale, to all parties concerned.

5. The resident shall be given a written statement of the decision and its rationale.

6. The Superintendent shall formally review both the decision of the Hearing Committee and the decision of the Program Review Committee.

J. Alleged behavior which violates the penal laws of the Commonwealth may be referred by the Chairman of the Hearing Committee to the Superintendent or his designee for action in accordance with Administrative Directive No. 004.

K. Placement in Administrative Custody or the Behavior Adjustment Unit shall be to control the resident's behavior until such time as he may be safely removed. This shall be formally reviewed by the Program Review Committee weekly. The resident shall be interviewed in person by this committee at least once every 30 days, and residents in this status for more than 30 days shall have their cases reported to the Commissioner of Correction, together with the rationale for such status and the particular programs prescribed.

IV. EMERGENCY BEHAVIOR CONTROL

Depending upon the situation, and the need for control, a resident may immedi-

ately be removed from his job, restricted in activities and/or confined to his own cell pending action as provided in paragraph III. A resident who poses a clear and present danger to himself or others may be placed in Administrative Custody or the Behavior Adjustment Unit on an emergency basis upon approval of the officer in charge pending action as provided in paragraph III. Otherwise a resident shall not be so confined until after disposition has been made in accordance with paragraph III.