Norman C. GRAY, Jr., et al.,
Plaintiffs,

v.

J. Shane CREAMER, Attorney General
of the Commonwealth of Pennsyl-
vania, Defendants.

Civ. A. No. 71–445.

United States District Court,
W. D. Pennsylvania.

May 28, 1974.

Ronald A. Berlin, Michael L. Rosenfield, Harry F. Swanger, Pittsburgh, Pa., for plaintiffs.

Stephen M. Sokel, Asst. Atty. Gen., Pittsburgh, Pa., for Commonwealth of Pennsylvania.

## OPINION

GOURLEY, Senior District Judge:

This is a Civil Rights proceeding filed pursuant to 42 U.S.C.A. § 1983 by plaintiffs who assert that various actions by defendants constitute violations of their constitutional rights. When this suit was instituted, all plaintiffs were inmates of the penal system of the Commonwealth of Pennsylvania and were incarcerated at various times at the State Correctional Institution at Pittsburgh. Defendants at the time this suit was filed were all employees of the Commonwealth of Pennsylvania, and all acted in some capacity in connection with the said penal institution. The Court has afforded the parties a full and complete trial and has considered the briefs and argument of counsel relative to plaintiffs' motion for attorneys' fees.

The plaintiffs contend that their constitutional rights have been infringed as a result of mail censorship, censorship of various publications, cruel and unusual punishment, denial of procedural due process, and being transferred as punishment for participation on the newspaper VIBRATIONS. Each of these contentions will be individually considered. However, the Court wishes to make clear that in determining whether there has been any violation of plaintiffs' constitutional rights it is guided by an overriding principle that:

"To determine, with precision, those rights which follow an inmate into prison involves a process of weighing and balancing conflicting interests. The desire that there be a maximum opportunity for the exercise of rights and privileges may often collide with the practical necessities of managing and administering a complicated penal community. The task of striking the proper balance between these conflicting interests is generally within the competence of the prison authorities. Thus, the federal courts have been understandably reluctant to intervene in "matters of state prison administration, recognizing that a wide latitude for judgment and discretion must be extended to prison officials." Gittlemacker v. Prasse, 428 F.2d 1, 4 (3d Cir. 1970)

The censorship of incoming and outgoing prisoner mail is an area which touches on the rights of both the prisoner and the sender or recipient of the mail. Procunier v. Martinez, 42 U.S. Law Week 4606, —— U.S. ——, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974).

The Supreme Court in this decision upholds censorship of prisoner mail provided two criteria are satisfied: (1) the regulation in question must further an important or substantial government interest unrelated to the suppression of expression, and (2) the limitations of First Amendment freedoms are no greater than necessary to protect the particular governmental interest involved.

The situation which prevails at the State Correctional Institution at Pittsburgh depends upon the category of mail involved. Incoming and outgoing privileged mail, i. e., mail from lawyers, judges and state and federal officials is not censored in any way. Such mail sent to prisoners is opened by the inmate-addressee in the presence of an employee of the Institution and simply checked for any contraband. Privileged mail sent by a prisoner is never opened or spot-checked. All non-privileged incoming mail is opened and inspected for contraband before the inmate receives it, but it is not read, censored or repro-

duced. Non-privileged outgoing mail is spot-checked for security reasons to insure that mail privileges are not being abused, as for example to prevent attempts to devise escape plans. Otherwise, outgoing mail is not censored, read, or reproduced. On this basis it must be concluded that there is no constitutional violation of plaintiffs' rights to receive or send mail, and that the criteria of *Procunier, supra,* are met.

■■ Closely related to the question of general mail censorship is the issue of the extent to which censorship of publications should be permitted. It is the Court's belief that the standard announced in *Procunier, supra,* is also applicable to the receipt of various periodicals, books and magazines. A censorship committee has now been established to implement an administrative directive which sets guidelines for the censoring of various publications. This directive is included in Part A of an Appendix to this Opinion and is consistent with standards set forth in *Procunier.* The Court is satisfied that the screening process as employed with respect to various publications at the Pittsburgh Correctional Institution does not seek to unnecessarily hamper freedom of expression and that a substantial governmental interest is served in maintaining prison security and discipline in implementing the directive. While there may have been a delay in establishing the censorship committee in accordance with the administrative directive, this resulted not from any effort to violate plaintiffs' rights, but from insufficient personnel at the prison.

Although in certain instances some books were returned to the publisher without being given to the inmate, these were occasions in which the prisoner had not complied with ordering procedures whereby a request is first submitted to the Institution and then forwarded to the publisher. Otherwise, the Court finds that there has been no censorship violative of plaintiffs' rights.

■ Plaintiffs contend that punishment in the form of transfer or segregation from the general population of the prison was meted out to them because of their participation on the newspaper VIBRATIONS. Transfer to another prison has been held not to be a violation of a prisoner's constitutional rights. Gray v. Creamer, 465 F.2d 179 (3d Cir. 1972). Moreover, the Court finds that no inmate was transferred to another institution or segregated from the general population solely as a result of activities on VIBRATIONS. Such segregation of prisoners as took place at the time VIBRATIONS was shut down was a result of information received by Defendant Walters on Sunday, April 18, 1971, that the tag shop at the Institution was to be the scene of a serious inmate disturbance on Monday, April 19, 1971. The Court is satisfied that no action in the form of transfer or segregation from the general population was taken by defendants in order to punish any plaintiff for his participation on VIBRATIONS. This conclusion is founded on the fact than many inmates segregated from the general population on or near April 19, 1971, had absolutely no connection with VIBRATIONS, while several on the staff of that newspaper were neither segregated nor transferred in April, 1971. Accordingly, no basis exists to conclude that plaintiffs were punished for an expression of their views on VIBRATIONS.

Plaintiffs contend that they were subjected to physical and verbal harassment and that conditions and treatment received by them and other prisoners in areas of administrative and punitive segregation constitute cruel and unusual punishment. Specifically, Plaintiff Harris asserts that he was subjected to administrative segregation on "A" Range pending an investigation, although he had violated no institutional rules or regulations.

Any statement made here would be less than candid if it did not give recognition to the often deplorable con-

ditions which prevail at the Pittsburgh Correctional Institution. But the Court is not prepared to determine that these conditions amount to cruel and unusual punishment; although deplorable, the conditions do not strike the conscience of the Court as being intolerable. Lee v. Tahash, 352 F.2d 970 (8th Cir. 1965). Furthermore, there has been no demonstration of barbarous conduct which is revolting in the extreme. Ford v. Board of Managers of New Jersey State Prison, 407 F.2d 937 (3d Cir. 1969).

■ The Court recognizes that the Eighth Amendment proscription against cruel and unusual punishment is founded on the basic goal of preserving "the dignity of man." Trop v. Dulles, 356 U.S. 86 at 100, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). Continuing, the Court in *Trop* indicated that the Amendment takes its meaning from "evolving standards of decency that mark the progress of a maturing society." Two additional tests have been set forth in Jordan v. Fitzharris, 257 F.Supp. 674 (N.D.Cal.1966): (1) is the punishment greatly disproportionate to the offense for which it is imposed; (2) does the punishment go beyond what is necessary to achieve a legitimate penal goal. See also Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910).

■ A review of the conditions as they exist at the State Correctional Institution at Pittsburgh convinces the Court that under none of the above tests have any plaintiffs been subjected to cruel and unusual punishment, nor has there been any physical and verbal harassment.

Areas of segregation within the State Correctional Institution at Pittsburgh consist of "A" Range, "J" Range, and the Behavior Adjustment Unit. Inmates are housed in "A" Range for *protective* and punitive administrative segregation and are reviewed weekly by the Program Review Committee. Inmates are housed temporarily in the front half of "J" Range upon their initial arrival at the Institution. The back half of "J" Range is used as transitional housing for inmates who have been in administrative segregation prior to their return to the general population.

The Behavior Adjustment Unit is reserved for inmates who display or have exhibited a pattern of abnormal and dangerous behavior within the Institution.

The Behavior Adjustment Unit is divided into four Ranges: "U", "V", "W" and "X" with the latter being reserved for the most difficult behavioral problems. Needless to say, conditions are restrictive in the areas of segregation. However, the cells are generally clean and free of rodents and insects. With the exception of "X" Range, inmates in the Behavior Adjustment Unit are permitted television and radio, and although limited, inmates of the Behavior Adjustment Unit do have visiting privileges, and opportunity for exercise, showers and use of library facilities.

More significantly, there are rehabilitative and educational programs available for inmates at the State Correctional Institution at Pittsburgh. Training in various vocations is available such as bricklaying, auto mechanics, welding and barbering. In addition, high school and college credits may be earned through courses at the Institution as was true for Plaintiff Harris who without paying tuition received ninety college credits from the University of Pittsburgh. Daily medical and psychiatric services are available to the inmates. Finally, it should be noted that the use by officers of the Institution of firearms, nightsticks, and chemical mace is severely limited and restricted. Firearms are carried only by correction officers working on the towers and the Institution's rotunda; nightsticks and mace cannot be used unless authorization therefor is obtained from the Deputy Superintendent for Operations. Thus contrary to plaintiffs' assertions that macing and beating is not uncommon, the Court finds that such activity is restricted and limited to the necessary control of be-

havior or disciplinary problems. In view of the foregoing, the Court concludes that plaintiffs' claims of cruel and unusual punishment are unfounded.

■ Of plaintiffs' substantive claims, there remains for disposition plaintiffs' assertion that they have been denied procedural due process as a result of being subjected to administrative segregation without a disciplinary hearing or any notice of the charges against them. On or about April 19, 1971, defendants caused certain inmates, including Plaintiff Moore, to be placed in segregation without a hearing. But as heretofore indicated, Defendants were acting on a reasonable belief that an emergency situation was developing, i. e., a possible serious disturbance in the prison tag shop. Under the circumstances, defendants acted reasonably and did not violate plaintiffs' constitutional rights. Gray v. Creamer, supra. The Court must conclude that the information of an impending riotous situation warranted defendants in acting as they did in placing Plaintiff Moore in segregation without a hearing. Biagiarelli v. Sielaff, 483 F.2d 508 (3d Cir. 1973).

The Court in *Biagiarelli* stated:

"We are not prepared to hold that the due process clause requires the prison authorities to provide "a prisoner with a statement of the evidence, which forms the basis for the removal of the prisoner from the general prison population. Even where the question is raised at the time of a criminal trial in the federal courts, the defendant generally is not entitled to have the prosecution furnish him with a detailed statement of the evidence the prosecution plans to use.

Biagiarelli was only entitled to either written notice of the basis for his removal from the prison population and an opportunity to rebut the charge, or a hearing. When the notice reasonably should have been given, or the hearing held, depended on when the threat to the institution subsided, regardless of whether he was held in punitive or administrative segregation. It is not feasible for courts to adopt hard and fast rules that will apply to every institution, or to every situation that might arise within a particular institution. Emergency conditions may require prompt and decisive administrative actions, and what is reasonable must be measured against the urgency of the circumstance necessitating the action. See Arzonica, [United States ex rel. Arzonica v. Schlipe, et al. 474 F.2d 720 (3d Cir. 1973)] *supra*. This rule of reason involves the weighing and balancing of conflicting interests referred to in Gittlemacker v. Prasse, *supra*, [428 F.2d] at p. 4. See United States ex rel. Tyrrell v. Speaker, 471 F.2d 1197, 1201 (3d Cir. 1973)."

■ On the basis of *Biagiarelli*, it must be concluded that plaintiffs' rights to procedural due process have not been infringed. In any event, plaintiffs' claims in this regard are now moot since Administrative Directive 801 of the Bureau of Correction, included herein in Part B of the Appendix, became effective November 1, 1972, whereby all inmates charged with major misconduct are given a disciplinary hearing. Inmates so charged are given advance written notice of the hearing and are advised that they may be represented by another inmate or a staff member. While it is true that an inmate, one Richard Mayberry, was placed in the Behavior Adjustment Unit upon his arrival at the State Correctional Institution at Pittsburgh on July 5, 1973, the Court is satisfied that this was proper in view of his background as a most dangerous individual who had immediately prior to his arrival been confined in Fairview State Hospital for mental observation. Prior to that, Mayberry had been incarcerated in the Behavior Adjustment Unit of the State Correctional Institution at Dallas. His placement in the Behavior Adjustment Unit of the State Correctional Institution at Pittsburgh was consistent with institution policy whereby an inmate transfer-

red from the Behavior Adjustment Unit of another institution is placed in Pittsburgh's Behavior Adjustment Unit, and then his status is periodically reviewed. Moreover, since Mayberry is not a plaintiff and the Court deems this case not to be a proper class action, violation of Mayberry's right, if such took place, is not before the Court.

It is well to note in connection with this determination that the present proceeding should not be deemed a proper class action that every inmate presents a different problem due to various factors, including age, education, previous experiences and activities in life. Moreover, an inmate's background and training, his state of mind, general attitude, and his physical and mental capabilities all help to determine what treatment is necessary, proper, and required for him as an individual. In view of the foregoing, the Court must conclude that there has been no denial of plaintiffs' rights to procedural due process.

The Court now turns to consideration of plaintiffs' motion for awarding counsel fees. The fees sought in this connection total $9,720 for 486 out-of-court hours and $3,450 for 115 in-court hours. Plaintiffs' attorneys contend that they have acted as "private attorneys general" and that by bringing this lawsuit they have furthered a significant national policy of prison reform. They assert that as a result of this lawsuit, prisoners' rights were expanded in the areas of due process hearings, censorship of books, publications, and mail. In addition, the newspaper VIBRATIONS, which was closed down when suit was instituted, was reestablished by consent order entered upon agreement of the parties. Plaintiffs' attorneys contend this was possible only through their efforts in representing plaintiffs.

Although plaintiffs' attorneys are to be commended for rendering their services gratuitously, the Court cannot reasonably conclude that attorneys' fees should be imposed upon defendants. In the first instance, no such fees can be imposed on the state because of the state's sovereign immunity, which has not been waived by virtue of the state paying the costs of transcribing the record of this proceeding, or in any other way. Jordan v. Gilligan, 500 F.2d 701 (6th Cir., filed July 18, 1974). Moreover, suits filed pursuant to 42 U.S.C.A. § 1983 must be maintained against individuals and cannot be directed against a state. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). With respect to the re-establishment of VIBRATIONS, the Court takes note of the fact that this was accomplished only when plaintiffs acceded to defendants' demands that the newspaper be subject to a censorship review board.

It is well to bear in mind that attorneys' fees are nor ordinarily taxable as costs and are awarded only in extraordinary cases. Bernstein v. Brenner, 320 F.Supp. 1080 (D.C.D.C.1970). The Supreme Court has indicated exceptions to the general rule in Hall v. Cole, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973), where it is stated that counsel fees may be awarded "to a successful party when his opponent has acted 'in bad faith, vexatiously, wantonly, or for oppressive reasons'". In addition, attorneys' fees may be awarded where plaintiff's successful litigation confers substantial benefit on members of an ascertainable class and an award will effectively spread costs among the class benefited. See also Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968); and Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593. In view of the conclusions reached in this case, the Court does not believe that there is a "successful plaintiff" in the sense referred to in *Newman, supra*. Moreover, although attorneys' fees were awarded in Commonwealth of Pa. v. Charleroi School District, 63 F.R.D. 440 (W.D.Pa., 1973), a § 1983 case involving school hair length regulations, the Court does not view this as setting a

precedent for all § 1983 cases. In the Charleroi School District case, the question of the right of a school district to regulate hair length had already been clearly and unequivocally decided,[1] and there is no question that, although no finding of bad faith was made in the *Charleroi* case, the Charleroi School District was knowingly acting outside the law. Such a conclusion is not warranted with respect to defendants in the present proceeding.

Certainly the award of attorneys' fees is an encouragement to the bringing of suit and the vindicating of rights which might otherwise not be accomplished.

However, the Court takes judicial notice of the virtual flood of prisoners' § 1983 complaints. Little if any encouragement is needed by way of awarding attorneys' fees in a case such as this matter before the Court. In view of the foregoing, plaintiffs' motion for attorneys' fees should be denied.

Findings of fact and conclusions of law have not been separately stated but are included in the body of the foregoing opinion as specifically authorized by Rule 52(a) of the Federal Rules of Civil Procedure.

An appropriate Order is entered.

### APPENDIX—PART A

| BC–ADM–814 | Administrative Directive | COMMONWEALTH OF PENNSYLVANIA |
|---|---|---|
| Subject:<br>    INCOMING PUBLICATIONS | | Department of Justice<br>Bureau of Correction |

### I. PURPOSE

It is the policy of the Bureau of Correction to give wide latitude to residents in selecting publications and subscribing to periodicals in order that educational, cultural, informational, religious, legal and philosophical needs of individuals will be satisfied.

It is the purpose of this directive to establish procedures regarding incoming publications which shall be applicable to all institutions in the Bureau of Correction.

### II. SCOPE

The procedures outlined in this directive shall cover the purchase and/or receipt of all outside publications including legal publications, fiction and non-fiction books, paper backs, correspondence courses, training manuals, reference materials, magazines, newspapers, religious tracts and pamphlets.

### III. GENERAL PROCEDURES

A. All publications shall be mailed directly from the original source, publisher, magazine distributor, department store or book store with the exception of small letter-size religious tracts and pamphlets which may be received in regular correspondence from family, friends or religious advisor.

B. An institutional staff committee of treatment and custodial representatives appointed by the Superintendent shall be responsible for clearing resident requests for outside publications and for reviewing publications received.

C. All decisions with respect to the approval or disapproval of outside

---

[1]. See Stull v. School Board of Western Denver Jr./Sr. High School, 459 F.2d 339 (3d Cir. 1972).

publications shall be based on the criteria of Paragraph IV. below.

D. Residents shall have the right to appeal to the Superintentent any staff committee decision disapproving a publication.

E. Should the Superintendent concur with the staff committee's disapproval, a resident may appeal to the Commissioner of Correction who shall evaluate the publication in conjunction with the Office of the Attorney General. The findings shall be communicated to all institutions.

IV. CRITERIA

A. Requests for and receipt of publications shall be disapproved when the publications contain the following:

1. Information regarding the manufacture of explosives, incendiaries, weapons or escape devices.

2. Instructions regarding the ingredients and/or manufacture of poisons or drugs.

3. Clearly inflammatory writings advocating violence, insurrection or guerrilla warfare against the government or any of its institutions.

4. Judicially defined obscenity.

B. No legitimate publication shall be prohibited solely on the basis that such publication is critical of penal institutions in general, of a particular institution, of a particular institutional staff member, of an official of the Bureau of Correction or of a correctional or penological practice in this or in any other jurisdiction.

C. The above criteria should not be interpreted so broadly as to affect recognized textbooks in chemistry, physics or the social sciences.

V. POSSESSION OF PUBLICATIONS

A. A reasonable quantity of reading materials shall be permitted to be retained by an inmate. Neatness and good order should be of primary concern rather than a specified number of publications. Excessive quantities shall be disposed by amicable agreement with the resident if possible. The following shall be considered as a guide:

1. Newspaper—no more than one week's accumulation.

2. Magazines—no more than 10 in possession.

3. All authorized school books.

4. All legal materials necessary for research or preparation of case.

5. Other books in reasonable quantities.

B. Transfers
Publications approved at one institution shall be honored by any other institution to which the resident may be transferred.

The foregoing has been approved by the Department of Justice, Bureau of Correction, and shall be *effective June 1, 1973*. This supersedes all previous directives on this subject and shall apply to all state correctional institutions.

Israel Packel

Allyn R. Sielaff
Commissioner of Correction

Attorney General

APPENDIX—PART B

| BC–ADM 801 | Administrative Directive | Commonwealth of Pennsylvania |
|---|---|---|
| Subject: Adjustment of Behavior | | Department of Justice Bureau of Correction |

## I. SCOPE AND PURPOSE

Institutional life shall be governed by standards of behavior designed to promote correctional objectives and to maintain the general welfare of the institutional community. The laws of this Commonwealth, the rules and regulations of the Bureau of Correction and of the institution are a part of the standards of behavior governing each institution.

Behavior which deviates from such standards shall be handled by staff in the manner prescribed by this directive. Such behavior shall be evaluated within the context of the total treatment plan of the individual, the effect of such behavior upon others and its consequences for the good order of the entire institution.

The methods used by staff shall be for the purpose of bringing about voluntary compliance with the standards prescribed. Sanctions shall be imposed only when necessary and in the degree necessary to regulate the unacceptable behavior.

## II. PUBLICATION OF STANDARDS OF BEHAVIOR

Rules and regulations which define expectations and prohibitions and which apply throughout the Bureau shall be established in writing in the form of Administrative Directives issued jointly by the Attorney General and Commissioner of Correction. Rules and regulations pertinent to each institution shall be established in writing by the respective Superintendents upon approval of the Commissioner of Correction. The above rules and regulations shall be as relevant to the norms of the general society as the special problems of group life in the institution shall permit. They shall be published by the distribution of individual copies to each staff member and to each resident. They shall be fully explained in resident orientation sessions, staff meetings and other training.

## III. PROCEDURES

A. Behavior problems which may be resolved by immediate counseling, warning or verbal reprimand shall be dealt with accordingly by the staff person involved. More serious violations shall be the subject of a Misconduct Report.

B. The JBC–141 form (Misconduct Report) shall be changed in style to a three-sheet snap set, one copy of which must be given directly to the resident by the staff member who writes the Misconduct Report. No action on the Misconduct Report will be taken unless this is done. One copy shall be retained by the staff person who wrote the misconduct. The third copy shall be forwarded to the Deputy Superintendent for Treatment Services.

C. As copies of the Misconduct Reports are received, the Deputy Superintendent for Treatment Services shall divide them into minor and major categories, consistent with the general intent of this directive. Major misconduct shall ordinarily be limited to acts which violate the penal laws of the Commonwealth or to repetitive violations of rules and regulations.

D. Minor Misconduct Reports shall be referred to the resident's support team—the team to include the individual resident's counselor, his housing unit officer and the relevant work and/or school supervisor. In the absence of any team member, his immediate supervisor shall substitute. The team shall be scheduled by the most appropriate member depending on the physical structure and general institutional procedures of each institution. The convening of the team shall be within 36 hours of the report, except that reports filed on Friday and Saturday shall be heard the following

Monday. The team shall meet with the staff person who initiated the report and the resident involved at any convenient location. The meeting shall be conducted as an informal but private group discussion aimed at achieving consensus in terms of the situation, rather than as an adversary proceeding. The primary objectives shall be to gain accurate knowledge of the facts, an understanding of the underlying causes of the behavior and to arrive at a sound decision for the treatment and control of the behavior exhibited. One or more of a wide range of alternative dispositions may be used as indicated by the individual situation, i. e., counseling, peer group interaction, group therapy, assessment of damages for property willfully destroyed, change of cell, restriction of privileges, reclassification with respect to custody or program status, and recommendation for transfer. Segregation status shall not be imposed by the support team. If the support team concludes on the basis of previous work with the resident that more serious sanctions may be appropriate, the team may refer the matter to the Hearing Committee with a written explanation regarding the referral. The decision of the team shall be reached in the presence of the resident and the staff member concerned when possible, but in all cases shall be given immediately to both parties along with the rationale for the decision. It will also be within the authority of the team to expunge the meeting from the record when they feel this warranted. As a general rule, Misconduct Reports handled by the team will not be formally entered against the resident's record for purposes such as parole, commutation, etc., but shall be recorded on the JBC–14 form only.

E. Major misconducts shall be referred to the Hearing Committee which shall be composed of the Chairman who shall be the permanent member (Major of the Guard), the resident's counselor or his immediate supervisor, and the resident's work/school supervisor or his immediate supervisor. When the matter has been referred from the support team, the counselor and work supervisor shall always be replaced by a supervisor.

F. Where the case has been referred to the Hearing Committee, the resident shall be informed in writing of this fact and given a specific date for a formal hearing; he shall be permitted assistance in presenting his case from either any staff member or any resident in general population status; he shall be permitted to meet with the person he chooses an appropriate length of time before the hearing; he shall be permitted to call witnesses at the hearing, the number of which shall be regulated by the Chairman of the Hearing Committee. The hearing shall be conducted in the following manner:

1. The circumstances of the charge shall be read and fully explained by the Chairman.

2. The resident shall be permitted to admit or deny the charges.

3. The staff person writing the Misconduct Report shall present his information and may call witnesses to support his claim.

4. The resident may present information available to him and others, with help from whomever he has chosen to assist him.

5. The committee members may interrogate the person making the report, the resident and others as necessary.

6. Upon completion of the hearing, the Hearing Committee shall take the matter under advisement.

7. After the decision is reached by the committee, the presenting parties shall be called before the committee to hear the decision and to be advised of its rationale and consequences.

8. A committee decision shall be based upon substantial evidence.

9. The resident shall be informed that the decision of the Hearing Committee will be formally reviewed by the Program Review Committee upon the resident's request. The resident shall indicate in the Misconduct Report whether he does or does not want a formal review and so attest by his signature.

G. The Hearing Committee may take the following actions:

1. Dismiss the charges.

2. Reprimand.

3. Adjust in accordance with measures outlined in III. D. above.

4. Invoke sanctions, including placement in Administrative Custody or the Behavior Adjustment Unit, but only when the acts of the resident indicate a continuing threat to himself or others.

H. The resident shall be entitled to have any decision of the Hearing Committee reviewed by the Program Review Committee, composed of the Deputy Superintendent for Operations, the Deputy Superintendent for Treatment Services and the Director of Treatment. In the absence of one of the foregoing committee members, the Superintendent shall designate an appropriate substitute. This committee shall not only review such decisions upon the resident's request, but shall also review weekly the program status of each resident in the Behavior Adjustment Unit, Administrative Custody, and Psychiatric Unit. This committee shall review the programming in these units and shall recommend changes when necessary.

I. Upon receiving a request for review of the Hearing Committee's decision, the Program Review Committee shall notify the interested resident and the Chairman of the Hearing Committee of the time set for the review. When that time arrives the hearing shall be held in the following manner:

1. The resident, with assistance if desired, shall present his objections to the decision.

2. The Chairman of the Hearing Committee shall present the case for the decision.

3. The Program Review Committee may question the individuals regarding the facts and the rationale for the decision.

4. The Program Review Committee shall take the matter under advisement and promptly render the decision, together with the rationale, to all parties concerned.

5. The resident shall be given a written statement of the decision and its rationale.

6. The Superintendent shall formally review both the decision of the Hearing Committee and the decision of the Program Review Committee.

J. Alleged behavior which violates the penal laws of the Commonwealth may be referred by the Chairman of the Hearing Committee to the Superintendent or his designee for action in accordance with Administrative Directive No. 004.

K. Placement in Administrative Custody or the Behavior Adjustment

Unit shall be to control the resident's behavior until such time as he may be safely removed. This shall be formally reviewed by the Program Review Committee weekly. The resident shall be interviewed in person by this committee at least once every 30 days, and residents in this status for more than 30 days shall have their cases reported to the Commissioner of Correction, together with the rationale for such status and the particular programs prescribed.

## IV. EMERGENCY BEHAVIOR CONTROL

Depending upon the situation, and the need for control, a resident may immediately be removed from his job, restricted in activities and/or confined to his own cell pending action as provided in paragraph III. A resident who poses a clear and present danger to himself or others may be placed in Administrative Custody or the Behavior Adjustment Unit on an emergency basis upon approval of the officer in charge pending action as provided in paragraph III. Otherwise a resident shall not be so confined until after disposition has been made in accordance with paragraph III.

A. The occurrence and adjustment of a minor behavioral problem need not be recorded at the discretion of the support team. Otherwise they shall record it as an entry in the JBC–14.

B. Upon request of the resident's counselor, the Program Review Committee shall review a resident's Cumulative Adjustment Record prior to his being considered for parole, commutation, or other major change of program status. If the committee concludes that the record of misconduct action does not fairly represent the resident's present behavior, the committee shall note in the record submitted in such cases that in the committee's judgment said action may be disregarded as not reflective of present behavior.

## VI. HOUSING CATEGORIES

The Bureau of Correction shall recognize the following housing categories for residents within State Correctional Institutions:

A. General population—for residents who do not require special physical measures for the control of behavior. May include honor quarters, pre-release unit or other program relating housing.

B. Administrative Custody—for residents found by the Hearing Committee/Program Review Committee in accordance with procedures established in this directive to require closer supervision than is provided in the general population.

C. Behavior Adjustment Unit—for residents found by the Hearing Committee/Program Review Committee in accordance with the procedures established in this directive to need close custody for the protection of themselves and others.

D. Psychiatric Quarters—for residents exhibiting psychiatric problems pending remission or transfer to a State Mental Hospital.

## VII. CARE AND TREATMENT

A. Administrative Custody housing shall be a separate unit or a group of cells in a designated section of a cellblock or infirmary. Residents therein shall have all rights and privileges accorded the general population except for curtailment of freedom to move about the institution and engage in programs with the general population.

B. The Behavior Adjustment Unit shall be in a separate block or

section of the institution providing close custody. The sole purpose for placing a resident in this unit shall be to control and treat his behavior until such time as he may be safely removed. No restrictions shall be imposed beyond those necessary for security.

C. Psychiatric Quarters shall, when practicable, be a separate section of the institution physically designed and programmed for the control and treatment of psychiatric problems.

D. Residents in the three categories above shall receive continuous attention by the institution's professional treatment staff in an attempt to restore self-control. The Program Review Committee shall release a resident from Administrative Custody or the Behavior Adjustment Unit as soon as diagnostically feasible.

E. A chaplain and a medical doctor shall visit residents in the Behavior Adjustment Unit and the Psychiatric Quarters each day and such visits shall be recorded in a log.

F. The placement, treatment and release of residents in Psychiatric Quarters shall be the responsibility of an institutional psychiatrist or psychologist.

G. The Superintendent shall personally review the case of each resident separated from the general population not less than once every sixty days. He shall maintain a written report of his findings in each of such cases.

The foregoing has been approved by the Department of Justice, Bureau of Correction, and shall be effective ——————————. This supersedes all previous directives on this subject and shall apply to all State Correctional Facilities.

J. Shane Creamer      Allyn R. Sielaff
Attorney General      Commissioner