**Edward J. Apache BAUER**

v.

**Allyn R. SIELAFF, Individually and as Commissioner of Corrections of the Commonwealth of Penna., et al.**

**Civ. A. No. 71-3049.**

United States District Court,
E. D. Pennsylvania.

March 4, 1974.

*series* of distributions in redemption of *all* of the stock of the two corporations.

Michael Klekman, Law Student, Indigent Prisoners' Litigation Program, University of Pennsylvania Law School, Philadelphia, Pa., for plaintiff.

Michael Minkin, Asst. Atty. Gen., Philadelphia, Pa., for defendants.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This a prisoner's civil rights action.[1] Plaintiff Edward J. Bauer is now confined in the State Correctional Institution at Huntington, Pennsylvania. This action seeks damages and injunctive relief as the result of several incidents which occurred when plaintiff was confined at the State Correctional Institution at Pittsburgh, Pennsylvania (Pittsburgh), and at the State Correctional Institution at Graterford, Pennsylvania (Graterford). Briefly summarized, plaintiff claims that: (1) he was denied due process in the course of being placed in segregation at both Pittsburgh and Graterford; (2) his treatment in segregation at Pittsburgh constituted cruel and unusual punishment; (3) he was improperly deprived of his legal materials at both institutions; and (4) a misconduct report improperly was placed on his record at Graterford.[2] The case

---

1. The action is brought under 42 U.S.C. § 1983 et seq. Jurisdiction is conferred on this Court by 28 U.S.C. § 1343.

2. It is only with respect to this charge that injunctive relief is sought.

was tried to the Court without a jury.[3] We will address each of plaintiff's claims individually and will set forth our findings of fact and conclusions of law on each claim pursuant to F.R.Civ.P. 52(a).

## II. *The Alleged Denial of Due Process in Being Placed in Segregation at Pittsburgh*

### Findings of Fact

On or about October 19, 1971, defendant Joseph R. Brierly (Brierly), then Superintendent of the State Correctional Institution at Pittsburgh, received information from the Pittsburgh Police Department that the plaintiff, along with several other inmates, was involved in a plot to attempt escape. Relying upon this information and in an effort to maintain the security of the institution while an investigation was made, the plaintiff (as well as the others) was taken from his cell in the general prison population and placed with the status of administrative segregation in a cell in the maximum security block. Plaintiff was not provided with a notice of charges or a hearing at that time, but merely informed that he was under investigation. On or about October 27, 1971, plaintiff was brought before Deputy Superintendents Walters and Wehrle, Major Jaczk and another unknown individual at the front of the maximum security block. At this time, plaintiff was told that the reasons he was in maximum security was because he was a "security risk" and "charged with conspiracy," but no further explanation was given. A similar meeting was held three or four weeks later.[4] Plaintiff remained in the maximum security cell block without a due process hearing and in the status of administrative seg-

regation until December 1, 1971, when he was transferred to Graterford in order to separate those allegedly involved in the escape plot in the Pittsburgh institution.

### Discussion

■ The present case falls squarely within the Third Circuit's holding in Biagiarelli v. Sielaff, 483 F.2d 508 (3d Cir. 1973). In fact, that case is on all fours and controlling, since Biagiarelli and plaintiff were allegedly involved in the same plot to escape, and Biagiarelli was also confined in maximum security administrative segregation from October 19, 1971, to December 24, 1971, without notice of any charges or a hearing. Biagiarelli brought suit and alleged that his confinement in segregation was a due process violation and constituted cruel and unusual punishment. In *Biagiarelli*, the Court of Appeals first reiterated its holding in Gray v. Creamer, 465 F.2d 179, at 185 (3d Cir. 1972), where it stated:

> . . . the transfer of a prisoner from the general prison population to solitary confinement without either notice of the charges or a hearing [6]

> 6. This is not to say, of course that this notice or hearing must in all cases precede the transfer to solitary confinement; in some cases, as, for example, during a prison riot, notice and hearing must be delayed a reasonable period of time.

> does not, absent unusual circumstances . . . meet minimal due process requirements.

Writing for the Panel, Judge Van Dusen went on in *Biagiarelli* to find: "This case presents an example of the 'unusual circumstances' referred to in *Gray*." *Biagiarelli, supra,* 483 F.2d at 511. Since *Biagiarelli* dealt with virtually

3. Pursuant to Local Rule 9½, the plaintiff was represented, and very ably, by Michael Klekman, a third-year law student at the University of Pennsylvania. The defendants were represented (also very ably) by the Pennsylvania Attorney General's Office. Trial counsel was Michael Minkin, Esq., Assistant Attorney General.

4. Neither of these meetings constituted notice or hearings that would satisfy the minimum requirements of procedural due process as required under Gray v. Creamer, 465 F. 2d 179 (3d Cir. 1972). But see discussion, *infra*.

identical facts as those raised by Bauer, we must follow it.[5]

There is however a second reason why plaintiff cannot succeed on this claim. Even if plaintiff had proved liability and damages, we would not award damages retroactively for a violation of the Third Circuit's new due process standards established in Gray v. Creamer, *supra*, which was decided on August 14, 1972. In the recent case of United States ex rel. Jones v. Rundle, 358 F.Supp. 939 (E.D.Pa.1973), the late Judge Body analyzed extensively the problem of retroactive damages in this area. He concluded that to the extent *Gray* makes new law in this circuit, it should not be made retroactive with regard to monetary damages. In reaching this conclusion Judge Body found that: (1) awarding damages was not needed to advance the major purpose of *Gray* of increasing fact-finding reliability; (2) the state law enforcement authorities had reasonably relied on the pre-*Gray* standards; and (3) making *Gray* retroactive in damages would have a dire effect on prison administration. While agreeing with Judge Body's conclusion, Chief Judge Joseph S. Lord, III advanced still another theory for finding a prison warden not liable for damages for following procedures later held unconstitutional. United States ex rel.

Bracey, Jr. v. Rundle, 368 F.Supp. 1186 (E.D.Pa., filed Nov. 29, 1973). In *Bracey*, Chief Judge Lord relied upon Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), where the Supreme Court held that a police officer is not liable for § 1983 damage claims flowing from arrests made pursuant to a statute later held unconstitutional, if at the time of the arrest he "reasonably believed [the statute] to be valid." 386 U.S. at 555, 87 S.Ct. 1213. Reasoning from *Pierson*, Chief Judge Lord found that a reasonable reliance on the validity of the prison procedures before *Gray* rendered defendant immune to plaintiff's damage claims. We agree with the persuasive reasoning in the *Jones* and *Bracey* opinions and therefore adopt their conclusion. Hence, we hold that defendants cannot be held liable retroactively for damages with respect to the due process claims asserted in this suit as arising before the *Gray* decision was handed down.

III. *The Allegation of Cruel and Unusual Punishment at Pittsburgh*

Findings of Fact

The plaintiff was in maximum security at Pittsburgh in a status of administrative segregation[6] from October 19, 1971 to December 1, 1971. The morning

---

5. The only difference in the cases that is potentially relevant is that Biagiarelli sought an injunction and declaratory judgment while Bauer seeks an injunction and damages. Since Biagiarelli was confined in maximum security even longer than Bauer and lost declaratory relief, *a fortiori* Bauer's claim for damages is even weaker. Nevertheless, we recognize that six weeks (for Bauer) and nine weeks (for Biagiarelli) confinement in maximum security without notice of charges or a hearing is a long time, even if labelled administrative segregation. In fact, in an opinion decided only one month after *Biagiarelli*, another panel of the Third Circuit held that segregated confinement for three days awaiting a due process hearing was not unreasonable under the circumstances. Braxton v. Carlson, 483 F.2d 933, 937 (3d Cir. 1973). In *Braxton*, prisoners were transferred after a near mutiny from a prison camp to punative segregation in another penitentiary, without notice of the accusa-

tion or a hearing prior to being transferred and placed in segregation. But the panel went on to add that further incarceration under segregated conditions could not have been justified. Even if *Braxton* applied to the instant case, indicating that plaintiff was denied due process by being held in administrative segregation for six weeks without an adequate hearing, plaintiff would not be entitled to retroactive damages for the reasons stated in the following text portion.

6. In Pittsburgh at that time, the only difference between administrative segregation and punitive segregation was that only punitive segregation was noted in the inmate's permanent record. The Commonwealth stipulated at trial that nothing is or will be placed on Bauer's record for consideration by the Pennsylvania Board of Parole regarding the plaintiff's placement in maximum security from October 19, 1971, to December 1, 1971, in Pittsburgh.

after plaintiff was placed in maximum security he was moved to another cell because the toilet did not work in the first cell. The cell included a sink with cold water, a commode, a bed (whose mattress was of the same type provided to inmates in the general population), a chair, and a small table.

After the first week of plaintiff's confinement in maximum security, he was given all the normal privileges provided inmates in maximum security. These included: daily exercise if the weather permitted; showers at least twice a week; three meals per day; a blanket and bed clothing; adequate clothing; personal property and hygiene implements (including a toothbrush, bath towel and hand towel); and regular visiting privileges. Plaintiff was also allowed to speak with fellow inmates during exercise periods and while he was in his cell. Since plaintiff had undergone surgery (a bilateral otoplasty on his ear) on August 18, 1971, he was also given medical treatment during his confinement in maximum security. A doctor came to maximum security every day. The plaintiff was not given his toothbrush or toothpaste in maximum security for about seven to ten days and he never received his comb or a pillow. While in maximum security plaintiff never received any reading matter, including the legal materials he had had in his cell in the general population. However, we find that plaintiff did not establish that he had repeatedly or even specifically requested such material. And we find no evidence that defendant Brierley or any of his subordinates acted intentionally to deny plaintiff any reading matter, including his legal materials.

Some roaches and mice occasionally entered plaintiff's cell, and left since there was no food around. Similar conditions existed on the entire 14 acres of prison grounds. The officials at the State Correctional Institution at Pittsburgh are aware that they have a potential problem with vermin due to the age of the institution and the dampness in the area along the Ohio River which the prison adjoins, and they have one full-time exterminator working to control the potential problem, although not entirely successfully.

In maximum security the guards controlled the lights which were on at all times, including at night.

Plaintiff was denied the opportunity to work in the kitchen for 75¢ per day or attend education classes during the time he was in maximum security, although he had these opportunities before being placed in maximum security.

*Discussion*

None of these findings alone, nor all of them together, constitute cruel and unusual punishment under the Eighth Amendment to the Constitution. In evaluating what constitutes cruel or unusual punishment, this circuit has said:

> Solitary confinement does not, in and of itself, violate Eighth Amendment prohibitions, and the temporary inconveniences and discomforts incident thereto cannot be regarded as a basis for judicial relief.

Ford v. Board of Managers of New Jersey State Prison, 407 F.2d 937, 940 (3d Cir. 1969) (footnote omitted). In United States ex rel. Tyrrell v. Speaker, 471 F.2d 1197, 1202 (3d Cir.), cert. denied, Milam v. Reading & Bates Offshore Drilling Co., 411 U.S. 921, 93 S.Ct. 1550, 36 L.Ed.2d 314 (1973), the Court went on to find that inadequate heating in the cell and the fact that while in punitive segregation for eight months, Tyrrell was allowed out only for meals, showers and short exercise periods, did not present the extreme type of conditions required to establish an Eighth Amendment violation. *But cf.* Knuckles v. Prasse, 302 F.Supp. 1036 (E.D.Pa. 1969) (confinement of two prisoners for 2½ days to cell with no window or artificial light, a single bed, no clothing or toilet articles, and a malfunctioning toilet held cruel and unusual punishment but did not justify monetary damages or injunction); aff'd 435 F.2d 1255 (3d Cir. 1970), cert. denied, 403 U.S. 936, 91 S.Ct. 2262, 29 L.Ed.2d 717 (1971); Ram-

sey v. Ciccone, 310 F.Supp. 600 (W.D. Mo.1970) (not cruel and unusual punishment if prison officials act negligently in failing to provide needed medical treatment, although it would have violated the Eighth Amendment if they had denied such medical assistance intentionally).

■ We recognize the fact that in maximum security plaintiff was deprived of certain privileges he would have had in the general population, but we do not find denial of any of these privileges so severe as to constitute cruel and unusual punishment. Plaintiff was not denied any of the minimum necessities of life, including water, food, clothing, sleep, exercise, sanitary toilet and washing facilities, reasonable medical treatment, and human contact and communication. Deprival of a comb or pillow, or even failure to give him his toothbrush and toothpaste for about seven to ten days and the discomfort of lights at night do not constitute a constitutional deprivation. While the existence of roaches and mice is a deplorable condition, it was not so adverse as to constitute cruel and unusual punishment. Finally, although it is reprehensible to confine anyone without access to any reading material, and particularly to deny an inmate his legitimate legal material, we cannot conclude that such denials reach the level of cruel and unusual punishment. Our conclusion is supported by the fact that no defendant maliciously or even intentionally acted to deny these reading matters to plaintiff.

### IV. *Deprivation of Legal Materials at Pittsburgh*

#### *Findings of Fact*

Before plaintiff was transferred from the general prison population to maximum security on October 19, 1971, he had had a trial transcript, legal size writing paper and carbon paper in his cell. The trial transcript related to his February 1970 conviction carrying a 5 to 15 year sentence for burglary in Allegheny County. Bauer's appeal to the Pennsylvania Supreme Court was pending at this time; he was represented by J. Graham Sales, Jr., a public defender. We find that defendants did not intentionally deprive plaintiff of these legal materials. They had no policy against giving them to plaintiff in maximum security; in fact defendants' policy was to have such material transferred automatically to an inmate moved from the general population to maximum security. Plaintiff also had access to some legal information through another inmate in maximum security, and he had paper and pen for writing. Evidence of these facts is plaintiff's complaint which was notarized on October 27, 1971, and which included several extensive quotes and precise cites from legal cases. Plaintiff had only a seventh grade education (although he had taken a GED test and earned a 9th grade equivalent). He admitted that he only "dabbled in the law" while in prison. Plaintiff failed to prove any specific injury to his appeal before the Pennsylvania Supreme Court or any other injury to his legal affairs as a result of his not receiving in maximum security the legal materials he had had in his cell in the general prison population.

#### *Discussion*

■■ We recognize that a prisoner has the constitutional right to have reasonable access to the courts. Ex parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941); Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). But access to the courts and not access to particular legal documents at specific times is the real issue. If a prisoner has reasonable access to legal counsel then he has the means to prepare, serve and file whatever documents are necessary. Whether or not in a particular case the access afforded is reasonable depends on all the circumstances and a balancing of the prison's asserted interest against the claimed right of the prisoner and the degree to which it has allegedly been infringed by the challenged prison action. *Compare* Hatfield v. Bailleaux, 290 F.2d 632 (9th Cir. 1961) (upheld prison restriction on in-

mates' access to law books in isolation for 27 days) *with* Gilmore, Jr. v. Lynch, 319 F.Supp. 105 (N.D.Cal.1970) (three-judge court held limited list of law books in prison library denied reason- able access to courts at least for those without lawyers or other legal assist-ance), aff'd sub nom. Younger v. Gil-more, Jr., 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971).

■ Plaintiff cannot prevail on this claim for several reasons. First, plain-tiff did not prove that he was denied ac-cess to the courts even in an indirect or transitory sense. Secondly, there was no evidence that anyone acted intention-ally to deprive plaintiff of his legal ma-terials. Finally, even if plaintiff had proven a constitutional right to these papers, he failed to prove that he suf-fered any actual damage [7] as a result of his failure to receive these materials while in maximum security. Plaintiff's lawyer was still able to pursue Bauer's appeals, and plaintiff could still commu-nicate with his lawyer. While in maxi-mum security, plaintiff even was able to file a handwritten complaint in this case with extensive quotes and precise legal cites. There is no evidence on the record that plaintiff's failure to have these legal papers with him in maximum security affected his legal situation be-fore the courts or elsewhere.[8]

## V. *The Alleged Denial of Due Process in Being Placed in Segregation up-on Transfer to Graterford*

### Findings of Fact

On December 1, 1971, in order to sep-arate those who were allegedly involved in the conspiracy to escape from the State Correctional Institution at Pitts-burgh (see § II *supra*), plaintiff was transferred to the State Correctional In-stitution at Graterford, Pa. Every in-mate who is transferred to Graterford (unless he is a former inmate of Grater-ford who is returning after being tem-porarily in another institution for medi-cal or court reasons) is automatically, and without a hearing or notice, placed in segregation upon his arrival. Securi-ty reasons underlie this policy; in par-ticular, prison authorities want to insure that the inmate will be in no danger in the general prison population and that he has no questionable prior involve-ment with other residents or personnel at Graterford. The transferee remains in segregation until interviewed by the Graterford behavior clinic committee. Usually this interview is conducted as soon as the transferee's records arrive, normally within two days of the in-mate's arrival.

Plaintiff was placed in maximum se-curity segregation on his arrival at Gra-terford on December 1, 1971. On De-cember 7, 1971, he was interviewed and placed in the general prison population. The delay was because plaintiff's Pitts-burgh records had not yet arrived at Graterford; Superintendent Johnson and Deputy Superintendent of Opera-tions, Mr. Parcell, had only verbal infor-mation that plaintiff was believed to be part of a security problem at Pitts-burgh. Yet despite the fact that the written records had not yet arrived the behavior clinic committee acted to re-move plaintiff from maximum security after six days.

7. Under federal common law, and in the ex-ercise of discretion, we could however award nominal damages, even if not alleged, if plaintiff had proved deprivation of a recog-nized right. Basista v. Weir, 340 F.2d 74, 87 (3d Cir. 1965).

8. The plaintiff argues that defendants Brier-ley and Sielaff are liable for damages under § 1983 on a theory of *respondeat superior.* In light of our findings that plaintiff is not entitled to damages for denial of his legal material, since he has not proven he was de-prived of a recognized legal right or that anyone acted intentionally to deprive him of his legal materials, we do not need to reach this issue. This is still an unsettled area of the law, and we would be ill advised to ad-vance unnecessary dicta on a question not before us. (See discussion and cases cited in Anderson v. Nosser, 438 F.2d 183, 199 n. 13 (5th Cir. 1971), modified, 456 F.2d 835 (5th Cir. en banc), cert. denied, 409 U.S. 848, 93 S.Ct. 53, 34 L.Ed.2d 89 (1972).

Plaintiff's status in maximum security at Graterford from December 1 to December 7 was administrative and not punitive segregation. While the privileges and conditions of administrative and punitive segregation are virtually the same in maximum security, only evidence of punitive segregation is placed in an inmate's record. Accordingly, plaintiff's prison records do not reflect his confinement in maximum security from December 1 to December 7, 1971.

*Discussion*

■■ While we find as a matter of fact that plaintiff was denied a hearing or notice before being placed in segregation at Graterford, as a matter of law we do not find this procedure on transfer to Graterford to be a per se violation of due process. First, we note that "[c]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). Here, the prison regulation was justified by a concern for security which went to the protection of the inmate as well as to the security of other residents, personnel and the institution. In view of the oral information which they had about plaintiff's alleged threat to the security of the State Correctional Institution at Pittsburgh, it was reasonable under the circumstances for the Graterford authorities to segregate plaintiff for a limited time in the maximum security block. While the behavior clinic committee did not interview plaintiff as quickly as they do most inmates, that was not because of an intentional deprivation, but because they had not yet received his records from Pittsburgh and were waiting for them to arrive, so that they would have more information before placing him in the general prison population. When plaintiff's records from Pittsburgh had still not arrived

after six days, the behavior clinic staff reviewed his situation and released him from maximum security to the general prison population. Under the circumstances, we find that plaintiff's six-day confinement in maximum security at Graterford was not unreasonably long and did not constitute a constitutional deprivation.

Even if we had found plaintiff's transfer to Graterford's maximum security to violate the due process standards of Gray v. Creamer, 465 F.2d 179 (3d Cir. 1972), we would not award plaintiff any damages in light of our analysis in part II, *supra*.

VI. *The Claims Arising from Being Placed in Segregation for an Alleged Misconduct at Graterford*

*Facts*

On February 1, 1972, at about 8:30 p. m., Correction Officer Joseph Piech saw Thomas Ambers, another inmate, in plaintiff's cell with a hypodermic needle and syringe containing an unknown substance. We credit plaintiff's testimony where he described the syringe as very large and "like something you shoot a horse with." (N.T. 134.) Plaintiff also claimed that Ambers had found the syringe in the shower room and brought it to plaintiff's cell to ask him if he had ever seen anything like it before. (N.T. 134.) Later that evening, Officer Piech wrote a misconduct report of this incident charging plaintiff with possession of a hypodermic needle and a syringe. On February 2, 1972, defendant Captain William Schildt picked up this misconduct report which included a notation to hold plaintiff for a Pennsylvania State Police investigation. Usually (as a matter of long-standing informal oral directive) defendant Johnson (the Graterford Superintendent) made the decision whether there would be a state police investigation and caused his decision to be noted on the misconduct report. On February 2, 1972, Captain Schildt called plaintiff before him along with Mr. Britt, an escorting officer. At this

meeting, Schildt read the misconduct report to plaintiff and asked him if it was true, partly true or false. Since a state police investigation was requested, Schildt followed the long-standing practice at Graterford of asking no further questions and not discussing the misconduct report with the inmate. After plaintiff looked over the misconduct report a couple of times, he said it was true in part, although he repeatedly tried to give a qualifying explanation of parts of it. However, Schildt refused to allow plaintiff to explain his position and would not discuss it with plaintiff further. Thereupon, Schildt noted on the report that plaintiff had said it was true.

Since plaintiff was to be held for a state police investigation, Captain Schildt, because of a long-standing oral directive at Graterford, did not have the authority to return plaintiff to his cell in the general prison population. Schildt had to choose between sending plaintiff to administrative segregation in maximum security or in B–Block which was not maximum security.[9] Since Schildt felt plaintiff was not a threat to the population and no one was hostile to plaintiff, he decided to send plaintiff to B–Block. Schildt then informed him that he would be held in B–Block for the Pennsylvania State Police investigation of the syringe incident. It was institutional policy at Graterford at this time, that when an inmate is being held for a state police investigation, he is not given a hearing by the prison authorities until the state police investigation is completed.

Before plaintiff was sent to B–Block, he had had in his general prison population cell two transcripts, one of his conviction for burglary and one of his conviction for violation of the Dangerous Drug & Cosmetic Act. At the time plaintiff was placed in B–Block, his attorney was working on a petition for writ of allocatur to the Pennsylvania Supreme Court on the burglary conviction and was appealing to the Superior Court from the denial of his motion on the Dangerous Drug & Cosmetic Act conviction. At the conclusion of the meeting between Capt. Schildt and plaintiff on February 2, 1972, plaintiff asked Schildt if he could return to his cell to get his personal belongings (presumably including his legal material). Plaintiff also asked Sergeant Moore on B–Block to call for his personal belongings in his cell in the general prison population. Plaintiff failed to establish that he repeatedly or even specifically requested his legal materials. Captain Schildt told plaintiff that his belongings would be sent to him in B–Block. It was the routine practice at Graterford at this time to send personal belongings to a man moved into

9. Although an inmate may be placed in the status of administrative segregation in either the maximum security block or B–Block, there are some differences in the conditions in each area. In B–Block, the cells are similar to those in the general prison blocks. However, the men in B–Block may not move about the prison unescorted and are restricted to their cells except at exercise and meal times. Nevertheless, in B–Block they have windows in the backs of their cells so they can see and talk to the men in the adjacent cells on either side. They can also communicate with the other men in the B–Block mess hall and when they exercise in groups of 6–10 in the yard. Plaintiff was permitted to talk with two residents from the law clinic who visited him in B–Block after he requested to see them. In addition, the men on B–Block can order books from the library or goods from the commissary, although they cannot go themselves to these parts of the prison. While in B–Block, plaintiff was restricted from going to education classes or movies or performing his work as a runner for 35¢ or 50¢ a day, all of which he could have done if not in segregation. In maximum security, the men eat in their own cells rather than in a mess hall. Otherwise, they have comparable privileges and conditions to administrative segregation in B–Block. While plaintiff requested that we make the subject matter of this footnote a part of our findings of fact, he does not formally claim that such conditions constitute cruel and unusual punishment. Although we do not need to reach this issue, it appears that the conditions at Graterford were no worse (and were probably better) than in Pittsburgh, which we held did not constitute cruel and unusual punishment.

administrative segregation. However, there was no evidence that Schildt or any other individual refused intentionally to send plaintiff his legal materials. Plaintiff never received his legal materials while in B–Block from February 2 to March 6, 1972, although he did receive his other personal belongings. He was allowed to correspond by mail with his attorney and did in fact write letters to and receive letters from his attorney.

While in segregation from February 2 to March 6, 1972, plaintiff's movement around the prison was restricted. He could not go to the mess hall or movies or education classes provided the inmates in the general population. He could eat in the dining hall for the segregated population and was allowed out in the yard, when weather permitted, to exercise with the other inmates in segregation. Before being placed in segregation at Graterford, plaintiff was earning 35¢ or 50¢ per day as a runner (i. e., a messenger). While in maximum security he could not perform this job or earn these wages. After being released from segregation he was given a job in the greenhouse instead of keeping his old job. While the record does not reveal whether this new job paid more or less, we credit plaintiff's statement in court that the new job was no better or worse than the old one.

Plaintiff remained in administrative segregation in B–Block from February 2 to March 6, 1972, while the investigation was pending. On February 2, 1972, a urine specimen was taken from plaintiff and sent to National Medical Services, Inc. for analysis. On or about February 7, 1972, Graterford officials received a toxicology report showing that the urine specimen test was "presumptively positive" for amphetamine. However, this toxicology report was introduced only for the purpose of showing it was sought and received and not to prove its truth. Therefore, we make no finding as to whether plaintiff was under the influence of an amphetamine on February 2, 1972, when charged with a misconduct for possession of a syringe.[10] On two occasions, once in mid-February and on March 3, 1972, Deputy Superintendent of Operations at Graterford, Parcell, called the State Police investigating officer to inquire if a report had come back from the laboratory as to the contents of the syringe. It was not until March 3, however, that Deputy Superintendent Parcell informed the State Police that plaintiff was being held in administrative segregation until their investigation was complete.[11]

On or about March 6, 1972, members of the prison's Behavior Clinic treatment staff interviewed plaintiff. At this interview, plaintiff was told that he would be placed back in the general population, but that if the state police lab report indicated that narcotics were in the syringe, he would later be charged with possession of narcotics. While plaintiff was present, the record is unclear whether he was allowed to present his version of the February 1, 1972, incident (see N.T. 208, 151, 191–93, and 195–96). Neither the officer who had written the misconduct report nor Capt. Schildt were present. Nevertheless, the treatment staff concluded that plaintiff was guilty of the misconduct as written (i. e., possession of a syringe and hypodermic needle in violation of the prison

---

10. We have no reason to credit or discredit Officer Piech's version of this incident, and we do not have to make a finding as to the veracity of the facts contained in his report, since we are concerned here only with whether Bauer received a fair hearing on this incident. We do note, however, that Bauer's explanation is plausible, since it is unlikely he would have been using a syringe big enough for horses, and since no evidence of narcotics was found in the syringe by the Pennsylvania State Police laboratory. Put differently, we do not have to find whether the alleged misconduct was in fact true or false, as we are only concerned with whether defendants gave plaintiff a sufficient due process hearing and had enough evidence to place the misconduct on his record.

11. The state did not complete its investigation until April 18, 1972, when it reported that its laboratory tests showed that there was no controlled substance in the syringe.

rules), and they credited him with the time served in administrative segregation as his punishment. Officer Piech's misconduct report was placed in plaintiff's cumulative adjustment record. The Behavior Clinic's disposition of this misconduct report was placed in plaintiff's cumulative adjustment record. The misconduct report written by Officer Piech on the February 1, 1972, incident will be seen by the Treatment Staff when writing a parole summary about plaintiff, and the misconduct may be itemized on this parole summary. This misconduct report and parole summary will be available for inspection by the Pennsylvania Board of Probation and Parole when considering plaintiff for parole.

*Discussion*

We find that plaintiff was not given adequate notice or hearing concerning his confinement in segregation from February 1 to March 6, 1972, to meet the minimum standards of due process required under Gray v. Creamer, 465 F. 2d 179 (3d Cir. 1972). The *Gray* court approvingly quoted Sostre v. McGinnis, 442 F.2d 178, 198 (2d Cir. 1971), cert. denied 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740; 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972), for the proposition:

> If substantial deprivations are to be visited upon a prisoner, it is wise that such action should at least be premised on facts rationally determined. This is not a concept without meaning. In most cases it would probably be difficult to find an inquiry minimally fair and rational unless the prisoner were confronted with the accusation, informed of the evidence against him, . . . and afforded a reasonable opportunity to explain his actions. (Citations and footnote omitted.)

*Gray, supra,* 465 F.2d at 185. In Braxton v. Carlson, 483 F.2d 933 (3d Cir.

1973), the Third Circuit elaborated further on the nature and extent of the procedures required in a correctional institution setting to provide adequate due process. The Court held that proceedings in federal prison before an adjustment committee, whose function was rehabilitation as well as fact determination, comported with due process where prisoners put in punitive segregation received adequate oral notice of the charges, were informed of the substance of the evidence against them and were given an opportunity to respond, and where the committee made a reasonable investigation in order to rationally determine the facts. The Court said that due process under the circumstances did not require written notice or a written report, nor did it require representation by counsel or a lay substitute, confrontation and cross-examination of adverse witnesses or presentation of favorable witnesses.

Captain Schildt's meeting with plaintiff was not a hearing satisfying these standards, since plaintiff did not even have a reasonable opportunity to explain his position, even though he was confronted with the accusation (though not by the accusor) and informed of the evidence against him. Furthermore, Schildt's decision to send plaintiff to segregation was not based on "facts rationally determined," [12] but rather on the policy that all men held for a police investigation were to be placed in segregation pending the outcome of that investigation. Similarly, the Behavior Clinic's interview with plaintiff on March 6, 1972, did not meet the *Gray* and *Braxton* standards of a due process hearing. The record is unclear whether the plaintiff received an adequate opportunity to explain his position, and it may well be that he did not. Moreover, there is no indication that any reasonable investigation was made to rationally determine the fact of whether plaintiff was wrongfully in pos-

12. United States ex rel. Tyrrell v. Speaker, 471 F.2d 1197, 1203 (3d Cir. 1973).

session of the syringe. Plaintiff testified that another inmate found the syringe in the shower room and brought it to plaintiff's cell to ask plaintiff if he had ever seen anything like it before. In fact, the only apparent investigation made of the incident was done by the Pennsylvania State Police who concluded there was no controlled substance in the syringe. (See n. 11 *supra*.) In short, we conclude that plaintiff did not receive a due process hearing on the alleged misconduct.

Although plaintiff was denied due process, he cannot recover damages in light of the analysis in Part II, *supra*.[13] However, plaintiff is entitled to injunctive relief for this continuing injury. *See* McDonnell v. Wolff, 483 F.2d 1059, 1064 and n. 7 (8th Cir. 1973) (court found it appropriate in view of the damaging nature of misconduct reports to order expunged from prison records misconduct determinations arrived at in hearings that fail to meet minimum due process requirements). *See also* Black v. Warden, U. S. Penitentiary, 467 F.2d 202 (10th Cir. 1972); Hudson v. Hardy, 137 U.S.App.D.C. 366, 424 F.2d 854 (1970). We hold that: (1) there was no due process hearing before placing the alleged misconduct in plaintiff's records; and (2) the inclusion of this information in his records represents a continuing potential injury to plaintiff since it may adversely affect his chances for parole.

There remains the question of whether we can grant injunctive relief for a violation of due process that was not recognized as such by this Circuit in February or March of 1972.[14] The Third Circuit has not yet reached this question, Braxton v. Carlson, 483 F.2d 933, 936, 938 (3d Cir. 1973). In our view, enjoining the defendants in their official capacities to expunge the records is an appropriate remedy to prevent a continuing injury, since unlike damages which only compensate for past injury, an injunction is not retroactive in effect. There are other policy reasons why it is proper to grant an injunction while denying damages to correct a violation of due process standards set forth in *Gray*. It is considerably easier for prison officials to expunge records than to pay damages, and unlike the situation in the damage cases, there should be no dire effects on prison administration resulting from implementation of equitable relief such as an expungement order. Judge Body's analysis in United States ex rel. Jones v. Rundle, 358 F.Supp. 939, 952 (E.D.Pa.1973) supports our conclusion; Judge Body also granted equitable relief to expunge a prisoner's records of a misconduct report entered before and in violation of the standards in *Gray*. Accordingly, we hold that the prison records should be corrected by deleting any reference to the alleged misconduct of February 1, 1972, entered on plaintiff's file.

13. Even if we could award plaintiff damages retroactively, he would be entitled only to nominal damages at most for this denial of a constitutional right, Basista v. Weir, 340 F. 2d 74 (3d Cir. 1965). Plaintiff did not prove that he suffered any significant damages as a result of being deprived of his legal papers. He still had reasonable access to the courts through his lawyer with whom he kept in contact by letters; there is no evidence in the record that his motions to the Pennsylvania state courts or any other of his legal affairs were directly or adversely injured by the defendants in this case. Similarly, plaintiff proved no actual damages

resulting from his not being able to go to the dining hall or movies or education classes with the general prison population. The only real damages plaintiff alleged and proved were his lost wages while in maximum security. These amount at most to $15.50.

14. We note that the Third Circuit Opinion in Gray v. Creamer, 465 F.2d 179, was filed on August 14, 1972. Since then, the Bureau of Corrections has issued and worked under a new regulation (BC–Adm. 801) which is quoted at length in an appendix in Biagarelli v. Sielaff, 483 F.2d 508 (3d Cir. 1973).