James F. JORDAN et al., Plaintiffs,

v.

Floyd E. ARNOLD, Warden, U. S. Penitentiary, Lewisburg, Pennsylvania, Defendant.

Civ. No. 75–1334.

United States District Court, M. D. Pennsylvania.

March 1, 1976. As Amended April 28, 1976.

---

870

John M. Humphrey, Williamsport, Pa., for plaintiffs.

Joseph F. Cimini, Asst. U. S. Atty., Lewisburg, Pa., for defendant.

## OPINION

MUIR, District Judge.

This class action was filed by the named Plaintiffs on behalf of all inmates who are in or who are subject to being placed in cells on the first floor of the Special Housing Unit (hereafter S.H.U.) at the United States Penitentiary, Lewisburg, Pennsylvania. It was certified as a proper class action on December 22, 1975, and a hearing on both the preliminary and permanent injunctions was held from January 21, 1976 through January 27, 1976. At the end of the testimony and before oral argument, the Court, accompanied by counsel, toured the S.H.U.

## I. Findings of Fact.

1. The United States Bureau of Prisons authorizes the establishment of special housing units to facilitate the separation of certain inmates from the general institution population. (Exhibit P22)

2. The Special Housing Unit at the United States Penitentiary, Lewisburg, Pennsylvania is divided into three floors.

3. The third floor of the S.H.U. is used to house inmates assigned to Administrative Detention.

4. The second floor of the S.H.U. contains two sections, one section used to house inmates who are holdovers, either recent arrivals at Lewisburg or those being held over night while in transit to other institutions or to court appearances, and the other section used to house inmates assigned to Disciplinary Segregation.

5. The Plaintiffs are inmates of the S.H.U. at Lewisburg.

6. The first floor of the S.H.U. contains 14 cells, each of which measures approximately six feet wide by twelve feet long by 8½ feet high.

7. At the S.H.U., shower facilities are located on each of the three floors of the S.H.U. and shaving gear is given to each inmate.

8. A gymnasium for persons in the S.H.U. is located on the second floor and offers weight-lifting apparatus, basketball hoop and a calesthentics area.

9. This gymnasium is approximately one-half the size of the courtroom at the United States Courthouse in Lewisburg.

10. At the time the named Plaintiffs were brought to the first floor of the S.H.U., cells 101, 102, 103 and 114 were classified as Disciplinary Segregation cells.

11. At the time said Plaintiffs were brought to the first floor of the S.H.U., cells 104 through 113, inclusive, were classified as either Administrative Detention or Disciplinary Segregation cells.

12. The cells on the first floor of the S.H.U. are deemed more secure than those on the other floors, in part because the first floor cells have steel doors and the cells on the other floors have wooden doors.

13. Some inmates who are housed in the S.H.U. require the presence of two, three or four correctional officers when they are out of their cells for any reason.

14. Prior to the commencement of this action, each of the cells 101, 102, 103, and 114 had a concrete commode which could only be flushed by correctional officers from outside of the cell.

15. Prior to the commencement of this action, each of said cells also had a small pipe in the wall for drinking water which could only be activated by a correctional officer by pushing a button outside of the particular cell.

16. The only other contents of cells 101, 102, 103, and 114 consisted of a bed frame bolted to the floor upon which a mattress is placed.

17. Each of the doors in the S.H.U. has a small opening or wicket which may be closed by the correctional officers from outside of the cells.

18. All of the cells on the first floor of the S.H.U. have windows which cannot be opened and through which no fresh air can pass.

19. The window at the outer end of the first floor corridor is sealed and no fresh air enters through it. The other end of the corridor opens into the institution.

20. Prior to the commencement of this action, the glass wall at the inner end of the corridor on the first floor contained a door which was kept shut at all times so that no air entered the corridor.

21. On December 30, 1975, there was no air movement whatsoever through the ventilation system in six of the cells on the first floor.

22. None of the remaining cells on that date had enough air movement through the ventilation system to meet the minimum standards of the Bureau of Prisons which require at least 10 cubic feet of air supply per minute. (Exhibit D–13)

23. The inadequate ventilation was caused by clogged registers in some of the cells, extremely dirty air ducts, and an inadequate exhaust fan.

24. The overall effect of the poor ventilation on the first floor of the S.H.U. was that the air was foul-smelling and extremely stuffy.

25. This poor ventilation caused adverse physical effects on the inmates housed in the cells including headaches and sinus trouble.

26. Prior to the commencement of this action, and up to December 30, 1975, the ventilation system for the cells on the first floor of the S.H.U. was completely inadequate.

27. Because of the inadequate ventilation system the heat supplied to the first floor cells could not be regulated effectively, making some cells too hot and others too cold.

28. At the time the complaint was filed, the windows in the cells on the first floor of the S.H.U. were painted over so that no light was admitted through said windows.

29. With the windows painted over, the inmates housed on the first floor of the S.H.U. had no view of the world outside their cells except through the small wicket in each cell door which gives a view to the inmate of up to four other cell doors on the first floor.

30. The lighting in the cells on the first floor of the S.H.U. is provided by two light bulbs located in a recessed compartment over the door of each of the cells.

31. One bulb in each cell is activated by one master switch relating to all such bulbs on one side of the corridor. The other bulb in each cell is activated by a single switch outside the cell. At the time the complaint was filed, one light was kept on in each cell throughout the night.

32. The light provided by the two light bulbs in the cells on the first floor of the S.H.U. was inadequate for reading.

33. The cells on the first floor of the S.H.U. are sometimes infested by ants.

34. Attempts have been made to exterminate the ants by spraying and this has proved generally effective.

35. There have probably been instances where inmates housed on the first floor of the S.H.U. have not received opportunities for two exercise periods of one hour each per week and two separate shower periods per week as are required by the Bureau of Prisons policy unless compelling security or safety reasons dictate otherwise. (Exhibit P22)

36. Those inmates who refuse exercise are permitted to shower during the exercise period.

37. Aside from the exercise and shower periods, those housed on the first floor of the S.H.U. are not permitted outside their cells except for visits, appearances before the Inmate Discipline Committee, sick call at the hospital, and telephone calls.

38. The cells on the first floor of the S.H.U. are only cleaned when the inmates housed therein are provided with cleaning supplies and utensils.

39. There is no maximum time limit on how long an inmate may be housed in the first floor cells of the S.H.U.

40. Inmates are subject to being held in a disciplinary segregation status indefinitely.

41. Inmates in disciplinary segregation status are given an opportunity for a review hearing every 30 days before the Institution Discipline Committee.

42. On October 6, 1975, Paul Neal was moved from the third floor of the S.H.U. to the first floor because a weapon was found in his third floor cell.

43. Paul Neal was confined in cell 101 from October 6, 1975, to October 7, 1975, and from October 9, 1975 to October 15, 1975, and was housed in other cells on the first floor of the S.H.U. until renovations began subsequent to January 8, 1976.

44. On October 9, 1975, Paul Neal was afforded a hearing before the Insti-

tution Discipline Committee (hereafter called I.D.C.) and was found guilty as charged.

45. On October 8, 1975, Alfred Jasper was moved from the general population to the first floor of the S.H.U., as a result of charges that he intended to escape.

46. Alfred Jasper was confined in cell 102 from October 15, 1975, to October 17, 1975, and was housed in other cells in the first floor of the S.H.U. from that time until renovations began subsequent to January 8, 1976.

47. On October 15, 1975, Alfred Jasper was afforded a hearing before the I.D.C. and was found guilty as charged.

48. On October 8, 1975, Ronald Del Raine was moved from the general population to the first floor of the S.H.U. as a result of charges that he attempted to escape.

49. Ronald Del Raine was confined in cell 101 from October 15, 1975 to October 17, 1975 and was housed in other cells on the first floor of the S.H.U. from that time until renovations began subsequent to January 8, 1976.

50. On October 15, 1975, Ronald Del Raine was afforded a hearing before the I.D.C. and was found guilty as charged.

51. On October 8, 1975, Francisco Torres was moved from the general population into the first floor of the S.H.U. as a result of charges that he attempted to escape.

52. Francisco Torres was confined in cell 103 from October 15, 1975 to October 17, 1975, and was housed in other cells on the first floor of the S.H.U. from that time until renovations began subsequent to January 8, 1976.

53. On October 15, 1975, Francisco Torres was afforded a hearing before the I.D.C. and was found guilty as charged.

54. All of Alfred Jasper, Ronald Del Raine, and Francisco Torres, named Plaintiffs, were indicted for the escape attempt on January 20, 1976 and their trial has been set to commence March 2, 1976.

55. The named Plaintiffs neither pursued nor exhausted available administrative remedy procedures with respect to their complaints although several complaints were communicated to correctional personnel by certain of the named Plaintiffs from time to time.

56. After the commencement of this action, the Lewisburg Penitentiary administration initiated certain corrective measures.

57. New sinks, capable of inside control, are presently being installed in cells 101, 102, 103 and 114 on the first floor of the S.H.U.

58. New commodes with control for flushing located in the cell but supplemented by override control by correctional officers from outside the cell in case of necessity are being installed in cells 101, 102, 103, and 114 of the S.H.U.

59. The ventilation system for the first floor of the S.H.U. has been substantially improved by the cleaning of the registers and air ducts, the installation of a larger pulley on the exhaust fan, and the placement of two expanded metal grills on each side of the glass door at the end of the corridor.

60. The ventilation system now provides an average of 9.6 air changes per hour per cell which is deemed adequate by Plaintiffs if maintained.

61. The paint on the windows on the first floor of the S.H.U. has been removed.

62. Presently, the lights in the first floor cells which have individual control for each cell are turned off at 11:00 P.M. or upon inmate request.

63. Presently the light bulb in each cell which is subject to control by one of the two master switches is turned off at 11:00 P.M. if a majority of the inmates on that side of the corridor whose lights are controlled by the master switch for that side wish all of the lights controlled by that master switch turned off.

64. During the daylight hours there is presently adequate light for reading in each of the first floor cells.

65. Since December 11, 1975, cells 101, 102, 103, and 114 of the S.H.U. have been authorized for use only in emergency situations approved by the Chief Correctional Supervisor or Associate Warden.

66. The Manual of Correctional Standards issued by the American Correctional Association provides that "inmates in segregation should be given a daily exercise period preferable (sic) in a special yard or in the main yard at a time when not occupied by other inmates." (Exhibit P23)

67. The National Advisory Commission on Criminal Justice Standards and Goals, Standards on Corrections, Standard 2.4 prohibits "any deprivation of clothing, bedding, light, ventilation, heat, exercise, balanced diet, or hygienic necessities" to those in segregated confinement. (Exhibit P24)

68. The United Nations Standard Minimum Rules for the Treatment of Prisoners provides that all prisoners should have at least one hour of exercise per day. (Exhibit P25)

69. The National Advisory Commission on Criminal Justice Standards and Goals, Standards on Corrections, Standard 2.4 also provides that segregated confinement as a disciplinary or punitive measure should not extend beyond 10 days duration. (Exhibit P24)

70. The Manual on Correctional Standards issued by the American Correctional Association provides that "segregation for punishment should be for the shortest period that will accomplish the desired result of favorable adjustment, and in any event not over 30 days." (Exhibit P23)

71. Federal prison policy authorizes the use of disciplinary segregation where serious acts of misconduct have been committed by inmates whose presence in general population would pose a serious threat to staff or other inmates or to the security of the institution. (Exhibit P22)

72. Federal prison policy provides that the quarters used for segregation shall be well-ventilated, adequately lighted, appropriately heated and maintained in a sanitary condition at all times. (Exhibit P22)

73. Federal prison policy provides that all cells used for disciplinary segregation shall be equipped with beds and that an inmate shall not be segregated without mattress, blankets, and pillow, except when prescribed by the Medical Officer for psychiatric reasons. (Exhibit P22)

74. All cells in the S.H.U. have beds and mattresses, and linens are provided upon occupancy.

75. Federal prison policy provides that each segregated inmate should have the opportunity for two periods of exercise of an hour's duration per week. (Exhibits P21 and P22)

76. Federal prison policy allows the exercise periods to be broken down into four periods of one-half hour each and provides that the exercise periods can be dispensed with if they constitute an undue security hazard. (Exhibits P21 and P22)

77. The Bureau of Prisons does not have a policy of limited exercise for punitive or disciplinary reasons.

78. The main reason exercise, over what is minimally required by Bureau of Prisons Policy, is not provided is that the Lewisburg Penitentiary lacks the requisite number of correctional officers to provide additional exercise to inmates in the S.H.U.

79. Federal prison policy provides that, aside from the exercise periods, each segregated inmate should have opportunities to shave and shower at least two times a week, unless these procedures would present an undue security hazard. (Exhibits P21 and P22)

80. Both the Penitentiary staff physician and psychiatrist have the authority to order the removal of an inmate from the S.H.U. for either mental or physiological health reasons.

## II. Discussion.

■ This action challenges certain conditions of confinement in the first floor cells of the S.H.U. of the United

States Penitentiary at Lewisburg as violative of the Fifth and Eighth Amendments to the United States Constitution as well as contrary to local and national Bureau of Prisons Policy Statements. Before discussing the issues raised and the evidence adduced at the hearing in this matter, the Court notes that ordinarily judges should defer in matters of security and prison administration to the expertise of corrections officials. They should not, however, "abdicate their constitutional responsibility to delineate and protect fundamental liberties." *Pell v. Procunier*, 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495, 504 (1974). I am troubled with the ever-increasing demands placed on this Court and the judiciary generally by the failure of the executive and legislative branches of government to respond properly to deplorable living conditions of those confined in prisons. Of the three branches of Government, the Courts are the least well-equipped to sift out the facts and policies appropriate to determinations of what treatment prisoners should or should not receive.

This Court has no intention of becoming an overseer of the day-to-day activities of the prison system. Neither will it establish what treatment prisoners ought to receive unless glaring abuses of constitutional rights or established laws and policies promulgated in the field are demonstrated. The trend to seek redress in the Court when the claim should more properly be addressed to the legislative or executive branches must be reversed. By way of example, the Defendant in this case moved to dismiss on the ground that the Plaintiffs had not exhausted the available administrative remedies with respect to their complaints. The Court denied the motion on January 9, 1976, on the basis of an affidavit that serious mental and physical health problems were at issue and that several of the named Plaintiffs and at least one member of the class were suffering from mental and physical problems as a result of confinement in the first floor cells of the S.H.U. The doctrine of exhaustion of administrative remedies was held in-applicable because of the time involved in pursuing them and the alleged irreparable injury being suffered by the Plaintiffs. In retrospect, the Court is of the view that a much stronger showing of immediate irreparable harm should have been required by the Court and that the doctrine of exhaustion should have been applied to this case. No credible evidence was produced at the trial that Plaintiffs, as stated in the affidavit filed in opposition to the motion to dismiss, actually suffered mental or physical problems which resulted from their confinement in the Special Housing Unit. However, as the Court has already taken testimony in the course of a five-day hearing and has viewed the premises in question, it would be improvident to dismiss the case for failure to exhaust administrative remedies and then possibly be obliged to spend another five days retrying the matter at some future date. The issues raised in the complaint will be discussed *seriatim*.

## A. Eighth Amendment Claims

■ The Plaintiffs' first, and most basic, claim is that incarceration in the first floor cells of the S.H.U. under the conditions and terms there prevailing constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. The Third Circuit Court of Appeals has held that solitary confinement does not, in itself, violate the Eighth Amendment, and "the temporary inconveniences and discomforts incident thereto cannot be regarded as a basis for judicial relief." *Ford v. Board of Managers of New Jersey State Prison*, 407 F.2d 937, 940 (3d Cir. 1969). However, conditions in segregation units can violate the Amendment if they fall below certain standards. See *Knuckles v. Prasse*, 302 F.Supp. 1036 (E.D.Pa.1969), *Aff'd* 435 F.2d 1255 (3d Cir. 1970), cert. den., 403 U.S. 936, 91 S.Ct. 2262, 29 L.Ed.2d 717 (1971).

In the absence of a clear test in this Circuit for determining what constitutes cruel and unusual punishment, this Court relies on *Wright v. McMann*, 387 F.2d

519, 526 (2d Cir. 1967) where "[the] civilized standards of humane decency" did not permit a man to be left nude in a cold cell for substantial periods and deprived of basic elements of hygiene such as soap and toilet paper. Wright held that such conditions violated "basic concepts of decency". *Id.* at 526, citing *Trop v. Dulles,* 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). That test was used by this Court in *Brown v. Mazurkiewicz,* Civil No. 73–697 (M.D.Pa. 10/25/74), and was held to encompass the "elimination of unsanitary and correctable situations even where they are something less than barbaric."

■ Prior to the commencement of this action, the physical conditions of the first floor cells of the Lewisburg Penitentiary S.H.U. violated that test. Little or no ventilation caused the cells to be stuffy and foul-smelling. Four of the cells had no sinks while the commodes and water supply in them could only be controlled from outside the cells. The cell windows were painted over so that there was inadequate light for reading and no view of the outside world.[1]

During the pendency of this case, the prison officials took several corrective measures with respect to the physical conditions on the first floor of the S.H.U. The ventilation system was cleaned and adjusted to provide an average of 9.6 air changes per hour, per cell. The paint was removed from the windows. New commodes and sinks with inmate controls were installed in the four cells without such units. The entire first floor area was repainted and assurances were given in open court by Associate Warden Grey that adequate lighting would be maintained. Furthermore, the lighting was changed to provide that it may be reduced at inmate request and even turned off completely at night if all the inmates on the same side of the corridor so request. These measures, if maintained, bring the physical conditions of the first floor cells within the "basic

concepts of decency" test, *Wright,* supra, and eliminate those correctable conditions which existed. Cf. *Brown v. Mazurkiewicz, supra.*

No regular inspections were made of the ventilation system either by Bureau of Prisons regional personnel or by the Lewisburg institution staff. This is probably why the system came to be so inadequate prior to this action. The Bureau should consider the creation of an Inspector General. An order will issue requiring the Defendant to maintain the ventilation system so that it provides 9 air changes per hour, per cell, to provide for regular inspection of the ventilation system by qualified ventilation personnel, and to maintain the other renovations made or presently planned for the first floor of the S.H.U.

■ Plaintiffs also complained of certain non-physical aspects of their confinement. Specifically, they contended that inadequate opportunity for time out of the first floor cells constitutes cruel and unusual punishment. The time out of the cells includes two exercise periods of one hour each and two shower periods per week. Inmates are also permitted out of the cells for Institution Discipline Committee hearings, visits by members of their families, telephone calls, and hospital sick calls. The issue of time out of the cell was somewhat confused with the issue of exercise both in the pleadings and at the hearing. The Court is not persuaded that such treatment, even coupled with no maximum time limit for Disciplinary Segregation status, constitutes cruel and unusual punishment.

Plaintiffs' reliance on the cases and authorities cited will be discussed *seriatim.*

*Pugh v. Locke,* 406 F.Supp. 318 (M.D. Ala.1976) per Johnston, J., provides a requirement of at least 30 minutes daily outside exercise for inmates in segregation and a maximum of 21 days confinement in isolation as a punishment.

1. Plaintiffs also complained of other physical conditions such as ant infestation and inadequate cleaning opportunities but the Court is not persuaded that these complaints were proved by credible testimony.

These were two of many requirements that were imposed by that Court as part of a revamping of the Alabama prison system which was found to be totally lacking in even the rudimentary conditions necessary for prisoner welfare and safety. The instant case is distinguishable in that the physical conditions of the first floor of the S.H.U. not only provide basic prisoner welfare and safety, but much more. There is but one inmate per cell; the food is adequate, even if cold at times; personal property is allowed; exercise is provided; the inmate's health, both physical and mental, is monitored by a physician and a psychiatrist who have the authority to move the inmate if necessary; and there are reviews of the inmate's status every 30 days by the Institution Discipline Committee which has the power to transfer the inmate to either less restrictive Disciplinary Segregation cells on the second floor or to Administrative Detention cells on the third floor.

In *Sinclair v. Henderson,* 331 F.Supp. 1123 (E.D.La.1971), the Court found that inmates in isolation on Death Row at the Louisiana State Penitentiary were only permitted out of their cells 15 minutes daily to shower. Some inmates have been living under this regime for more than 9 years. The Court held that this constituted cruel and unusual punishment. This case, like *Pugh v. Locke, supra,* was concerned with wholesale abuses of inmates' rights and is likewise distinguishable from the case under consideration. Moreover, there is no indication that members of the Plaintiff class have been incarcerated in the first floor cells longer than two months and, consequently, the same considerations do not arise as in the case of individuals incarcerated on a Death Row for years.

In *Rhem v. Malcolm,* 371 F.Supp. 594 (S.D.N.Y.1974), a class action involving the rights of pre-trial detainees housed in the Manhattan House of Detention, the Court found that 50 minutes of exercise per week, even supplemented by other recreational programs, was a violation of the Plaintiff's Eighth Amendment rights and ordered expanded exercise facilities to be built. However, no time limits were established by the Court for exercise. The Plaintiffs at bar have more exercise than those in *Rhem* and are not pre-trial detainees.

Plaintiffs also rely on *Bauer v. Sielaff,* 372 F.Supp. 1104 (E.D.Pa.1974) and *U. S. ex rel. Tyrell v. Speaker,* 471 F.2d 1197 (3d Cir. 1973). These cases establish that there was no cruel and unusual punishment in segregation settings allowing for daily exercise, but this does not, *ipso facto,* establish the principle that lack of daily exercise is cruel and unusual punishment. *Tyrell,* supra, also stands for the proposition that long continuous incarceration in segregation may constitute cruel and unusual punishment. I agree that it may, but have not been persuaded that it *does.*

### B. Policy Claims with Respect to Physical Conditions in the First Floor Cells

■ Plaintiffs claim that the physical conditions in the first floor cells of the S.H.U. violate both the National (Exhibit P22) and Lewisburg (Exhibit P21) Bureau of Prisons Policy Statements. Both policies require that "the quarters used for segregation shall be well-ventilated, adequately lighted, appropriately heated and maintained in a sanitary condition at all times." At the time of the commencement of this action, the conditions with respect to ventilation, lighting and heat were in violation of the Policy Statements. There is no credible testimony that the cells were not maintained in a sanitary condition at all times. Since the renovations, the Policy Statements are being complied with in these respects and this issue is moot. However, an order will issue requiring the Defendant to maintain conditions in the first floor cells in accordance with the Policy Statements.

Prison policy also requires that each segregated inmate be given the opportunity to shower at least two times per week and be permitted "no less than two (2) hours exercise each week. Exercise is to be provided in two (2) one (1) hour

periods, but if circumstances require, one-half hour periods are acceptable if the two (2) hour minimum is maintained." Both these requirements may be dispensed with if "compelling security or safety reasons dictate otherwise and these shall be documented."

Counsel for the Defendant admitted at the pre-trial conference that the shower and exercise periods were combined at times but gave assurances that the Policy Statement would be adhered to in the future. An order will issue requiring the Defendant to conform to the Policy Statement on showers and exercise in the future.

### C. Due Process and Policy Claims with Respect to Placement in the First Floor Cells

■ Plaintiffs' final claim is that their rights to due process guaranteed by the Fifth Amendment to the United States Constitution and the applicable provisions of the Bureau of Prisons and Lewisburg Policy Statements were violated when they were placed on the first floor cells of the S.H.U. prior to a hearing. See *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

Plaintiffs concede that there are some instances in which the Defendant may justifiably segregate an inmate prior to a hearing. They contend, however, that such segregation should be in Administrative Detention until the hearing rather than in the first floor Disciplinary Segregation Cells. Three of the four named Plaintiffs remaining in this case were moved from general population to the first floor cells of the S.H.U. on charges that they attempted to escape. They were given hearings seven days after their transfer. The fourth remaining Plaintiff was already in Administrative Detention when he was charged with having a weapon in his cell. He was moved to the first floor and received a hearing three days later.

The Supreme Court in *Wolff,* supra, declined to impose the full panoply of procedural due process rights on prison administrators in the disciplinary hearing context. Inmates were held to be entitled to rights under the Due Process Clause which were "subject to restrictions imposed by the nature of the regime to which they have been lawfully committed." *Id.* at 556, 94 S.Ct. at 2975, 41 L.Ed.2d at 951. The prison officials have incorporated the spirit of *Wolff* in their Policy Statements which have two provisions regarding placement in Disciplinary Segregation. The first, and general, provision states, "An inmate may be placed in Disciplinary Segregation only by direction of the Institution Discipline (sic) Committee following a hearing in which the inmate has been found to have committed a serious act of misconduct which warrants this serious sanction. Inmates found to have committed serious acts of misconduct should not be placed in Disciplinary Segregation unless their presence in general population would pose a serious threat to the staff, or other inmates, or to the security of the institution." (Exhibit P22, page 18.)

One exception to this general rule is found in the Policy Statements: "An inmate who is causing a serious disruption (threatening life or property) in Administrative Detention, who cannot be controlled within the physical confines of Administrative Detention, and who cannot be safely transferred to the institution hospital, may be moved temporarily (not exceeding three (3) days) to Disciplinary Segregation pending a hearing before the Institution Disciplinary (sic) Committee. The authority to order this temporary move to Disciplinary Segregation is limited to the official in charge of the institution at the time the move is ordered. A fully documented report of every such movement shall be immediately forwarded to the appropriate Regional Director." (Exhibit P22, page 17).

The Bureau of Prisons Policy Statements were violated with respect to the four named Plaintiffs when they were placed in Disciplinary Segregation prior to a hearing. Three were not in Administrative Detention so that the exception to the rule requiring a hearing prior to their placement in Disciplinary Segrega-

tion does not apply to them. The one who was in Administrative Detention was not shown to be uncontrollable while in Administrative Detention. Consequently, the exception does not apply to him either.

As violations of the Policy Statements have been clearly proven, an order will issue requiring the Defendant to follow the Bureau of Prisons Policy Statements concerning the placement of inmates in Disciplinary Segregation and, thus, the constitutional question need not be reached.

### III.  Conclusions of Law.

1.  Prior to the commencement of this action, the physical conditions of the first floor cells of the S.H.U. were such that housing of inmates therein constituted cruel and unusual punishment.

2.  The physical renovations planned in the first floor cells of the S.H.U., if finished and maintained, will bring them up to a constitutionally adequate level.

3.  The terms of confinement in the first floor cells of the S.H.U. do not constitute cruel and unusual punishment.

4.  There have been violations of the United States Bureau of Prisons Policy Statements with respect to ventilation, lighting, and opportunities for exercise and showers in the first floor cells of the S.H.U.

5.  The procedures utilized to place the named Plaintiffs in Disciplinary segregation status violated Bureau of Prisons Policy Statements.

An appropriate order will issue.